## SPRINKLE v. STATE.*

(In Banc, February 9, 1925.)

[102 So. 844.   No. 24434.]

1. CRIMINAL LAW. *Refusal to permit defendant's counsel to examine statement of deceased's dying declaration held error.*

Refusal to allow defendant's counsel to examine statement of deceased's dying declarations taken down by stenographer at district attorney's request, for use in cross-examination, *held* error.

2. CRIMINAL LAW. *Reading of newspaper article by jurors while in jury room held ground for new trial.*

Action of jurors in reading newspaper article in jury room, charging defendant with the commission of other crimes, *held* ground for new trial.

3. CRIMINAL LAW. *Rule as to admissibility of jurors' evidence as to misconduct in jury room stated.*

Jurors cannot impeach their own verdict by giving evidence as to what influenced their verdict, but may testify as to misconduct of other jurors and as to outside influences brought to bear on them.

4. CRIMINAL LAW. *Jurors could testify as to reading of newspaper article but not as to effect thereof.*

On motion for new trial, jurors could testify as to reading of newspaper article in jury room, but could not testify as to effect thereof on their verdict.

5. HOMICIDE. *Evidence as to deceased's reputation held admissible in prosecution involving issue as to whether defendant or deceased was aggressor.*

In homicide prosecution, involving issue as to whether deceased or defendant was aggressor, testimony that deceased had reputation of habitually going armed, and also had a bad reputation for peace, and that such character was known to defendant, *held* admissible.

SMITH, C. J., and HOLDEN, J., dissenting.

---

*Headnotes 1. Criminal Law, 16 C. J., section 2161; 2. Criminal Law, 16 C. J., section 2672; 3. Criminal Law, 16 C. J., sections 2750½, 2752; 4. Criminal Law, 16 C. J., section 2752; 5. Homicide, 30 C. J., sections 465, 468.

732                     SPRINKLE *v*. STATE.                [Sup. Ct.

APPEAL from circuit court of Harrison county.

HON. D. M. GRAHAM, Judge.

Levi Sprinkle was convicted of murder, and he appeals. Reversed and remanded.

*Mize & Mize* and *Geo. R. Smith,* for appellant.

The court erred in not compelling the district attorney to produce the written dying statement of the deceased, as requested by appellant. The district attorney was sworn as a witness and testified that on the morning of the 17th of December, 1923, he visited the King's Daughters' Hospital and saw Louis Faye; that the deceased was suffering a great deal and talked with much difficulty; that he had a conversation with him and that he made a statement to him as to how the affair occurred. At this juncture, the district attorney was asked the following: "Go ahead and tell the jury what he told you." When this question was asked, objection was made by appellant's attorneys who then asked some preliminary questions.

The district attorney gave the details of the conversation, over the appellant's objection. Repeated demands were made by appellant's counsel on the district attorney for the written dying statement, and all objections by the state to said demands were sustained, the district attorney continuing to refuse to produce the statement. What purported to be a dying statement was made by Faye to the district attorney. This statement or conversation was taken down in shorthand by a stenographer procured by the district attorney for that purpose, after which, said stenographer transcribed it. She says she is sure she took it down and transcribed it correctly; and the district attorney says it is substantially correct. After it was transcribed, the district attorney obtained it from the stenographer. Then, at the trial of the case, the district attorney, instead of introducing the written dying statement of

Faye, testified as to his own recollection of what the dying statement was, when, at the same time, he had the written dying statement in his pocked on the witness stand.

The dying statement detailed by the district attorney on the witness stand was most damaging to the appellant, and in fact was all of the testimony that the state introduced as to the actual facts. The object of appellant's request for the production of the written dying statement was to see the nature of the questions asked by the district attorney of the deceased and his answers thereto, as the dying declaration taken down and transcribed might have shown that the questions asked by the district attorney were leading questions. Dying declarations are subject to close scrutiny by a defendant, and it was certainly nothing but fairness and justice to appellant that the court require the production of the written dying statement.

The court erred in not allowing appellant to show the general reputation and character of the deceased for peace and violence.

George Robinson, on behalf of appellant, was asked the following question: "Q. Did you know Louis Faye during his lifetime? A. Yes sir. Q. State whether or not, if you know, he went habitually armed." Objection was made by the state and was sustained and defendant excepted. Then he was asked: "Q. Do you know his general reputation for going habitually armed?" Objection to this question was sustained. Then he was asked: "Q. Do you know his general reputation during his lifetime or the last two years of his life, for going habitually armed, carrying arms, in the community where he lived?" Objection to this was sustained, and exception taken. Similar questions were asked witnesses Farrell and Wittman.

All of the foregoing testimony offered by appellant as to the character of the deceased for peace and violence was certainly competent, under the rule laid down

in *Moriarty* v. *State,* 65 Miss. 654; *King* v. *State,* 65 Miss. 576; *Spivey* v. *State,* 58 Miss. 743, 858, where the court said that it was competent for the defendant to show the general reputation of the deceased for peace and violence, and that he went habitually armed and that defendant knew it.

The court erred in not granting the appellant a new trial on account of the reading by the jurors while they were considering their verdict of a newspaper, the Times-Picayune, containing an account of the trial and stating that the defendant had killed another man and had been accused of hi-jacking and that the citizens of Pass Christian had been trying to oust him from office and that it was contended that the only way to get him out of office was for him to be convicted of crime.

After the verdict was returned, counsel for appellant learned that before the jury had reached its verdict, various jurors had read said newspaper article, and embodied in his motion for a new trial the fact that said newspaper article had been read by members of the jury before reaching their verdict, and introduced the newspaper in evidence, and the facts concerning the obtaining of the newspapers and what was done with same. Three members of the jury testified to these facts and circumstances. Appellant introduced said newspaper, of date, June 17, 1924, and had certain portions copied in the record, giving a resume of the evidence and statements about the conduct of Sprinkles.

The refusal of the court to grant a new trial on account of the jurors reading this newspaper article was gross error. *Cartright* v. *State,* 71 Miss. 82; *Maddox* v. *United States,* 36 L. Ed. 917; *Styles* v. *State,* 129 Ga. 425; *State* v. *Caine,* 134 Ia. 147; *Myer* v. *Cadwalader,* 49 Fed. 32; *United States* v. *Ogden,* 105 Fed. 374; *People* v. *Leary,* 105 Cal. 486; *People* v. *Chinnon,* 146 Cal. 561; *W. Chicago St. Ry. Co.* v. *Grenell,* 90 Ill. App. 30; *Hempton* v. *State,* 111 Wis. 150; *Hamilton* v. *Pease,* 38 Conn. 115; *Morse* v. *Montana-Oregon*

*Purchasing Co.,* 105 Fed. 345; *Walker* v. *State,* 37 Tex. 366; *State* v. *Robinson,* 20 W. Va. 763; *Farrar* v. *State,* 2d Ohio 58.

It is shown by the record that this newspaper article remained with the jury in the neighborhood of about an hour before they reached their verdict, and the record affirmatively shows that this article was read by jurors before their verdict was reached.

For the errors herein discussed, this case should be reversed.

*Harry M. Bryan,* Assistant Attorney-General, for the state.

The district attorney testified that he himself made pencil notes of the dying declaration of deceased, and further testified that while Mrs. Meadows transcribed the dying declaration, it was not accurate.

It was a matter for the jury to pass upon the credibility of the district attorney's testimony and it has long been a rule that courts will not control the manner and order of the introduction of testimony so long as there is no abuse of substantial rights. The district attorney was the witness and if he, on his oath, said that the stenographic notes as transcribed were inaccurate, he had the right to refuse to surrender them to counsel and to submit his statement of what deceased told him to the jury for what it was worth.

Counsel urges, but not seriously, that it was unfair for the district attorney to be permitted to testify in this case since, "it was shown that there were several other persons who heard his dying statement." I know of no rule of law which prohibits the district attorney from taking the witness stand and testifying as to a matter of this kind, nor has counsel directed our attention to such.

We concede that the most serious question raised by counsel is whether or not the court erred in not grant-

ing appellant a new trial on account of the jurors reading a certain article appearing in the Times-Picayune prior to the rendition of their verdict. Considerable testimony was taken on the motion for a new trial and it cannot be successfully controverted that the jurors somehow obtained a copy of the Times-Picayune of June 17, 1924, in which was an account of the trial of the case. Some of the jurors testified that they read only small parts of the article, while it is in testimony that the whole of the article was read by some. The court held that the jurors could not impeach their verdicts but allowed testimony to show that the newspaper got into the jury room while the case was being considered.

We have read a great many authorities in preparing this brief on the misconduct of jurors in procuring copies of newspapers containing accounts of matters on trial before them. It is unnecessary for us to go outside our own jurisdiction for cases in which the question has been discussed if the rule as announced in *Cartwright* v. *State,* 71 Miss. 82, is held to apply to the instant case. But for a general summary of case law on the question we refer the court to the note appended to *Marion Capps* v. *State of Arkansas,* 46 L. R. A. (N. S.) 741. It is generally held by the weight of authority as will be seen from an examination of the above note that the reading by jurors in a criminal case of newspaper accounts of a trial, is not a cause for a new trial when the articles read were not of a nature to influence the jury.

In the Cartwright case the court said that newspapers containing the substance of the evidence of many of the witnesses who testified on the trial "as the same impressed itself upon the mind of the newspaper reporter," came into the hands of the jurors. To quote from the opinion: "It filtered through the medium of a partisan of the state, and was his version of the evidence. This version, too, was accompanied by remarks of the reporter unfriendly to the accused, and well calculated to excite prejudice in the mind of a reader. The homi-

cide was characterized as 'the unprovoked murder of two officers while in the discharge of official duty.' The defendants were declared to be the possessors 'of very unsavory and damaging antecedents.' ''

It will easily be seen that such statements as appeared in the copies of the papers before the jurors in the Cartwright case were prejudicial. The very language that the defendants were possessed "of very unsavory and damaging antecedents," coupled with the characterization of the homicide as an "unprovoked murder," was calculated to damage.

An examination of the article which appeared in the Times-Picayune shows that it was clearly an unbiased and frank statement of the proceedings of June 16th. If anything, the very headline itself, was favorable to appellant. In fact, in one paragraph appears this language: "He did not seem perturbed during the trial but talked laughingly with those who approached him."

It could very easily have been inferred by those of the jury who read the article that such was not the conduct of a guilty man.

Counsel complains that in the last two paragraphs of the article it stated that appellant had figured conspicuously in the court records of Harrison county, although. reference made in the article to the fact that he had been charged with other crimes, there is nothing that could be inferred from these statements that was prejudicial. Nor could the jury have been influenced by the statement in the article that efforts had been made to relieve appellant of his position as marshal of Pass Christian. The article stated that he had been elected by the people and that it was contended that he could not be removed until he had been convicted of crime, which, inferentially was a statement that he had not been so convicted of any wrong doing.

As to the action of the court in not permitting the defendant's witnesses to testify that deceased went habitually armed, we respectfully call the court's attention to

137 Miss.—47.

the fact that in the state of this case, such was not material, but that if it could be considered material, forms of questions asked by counsel for appellant were wrong and the answers thereto would have been incompetent.

In *Moriarty* v. *State*, 62 Miss. 654, cited by counsel for appellant, we find this language used by the court in its opinion: "If the character of the deceased as a dangerous man had been material it could have been proven only by evidence of general reputation. For reasons quite as obvious, the belief or conjecture of the witness that the deceased always went armed was, also, inadmissible."

In the light of the full record, we most earnestly contend that the state made out an overwhelming case to the satisfaction of the jury and that there is no substantial error.

*Mize & Mize* and *George Smith*, additional brief for appellant.

On the first point, that it is reversible error for the jury to have obtained and read the newspaper article as they did, we will give all of the Mississippi decisions as we think our original brief sufficiently discusses cases outside the state. *Lewis* v. *State*, 9 S. & M. 115; *Wood* v. *State*, 43 Miss. 364; *Nunnery* v. *State*, 87 Miss. 542; *Brown* v. *State*, 69 Miss. 398; *Wilkinson* v. *State*, 78 Miss. 356; *Wilcher* v. *State*, 54 So. 726; *McCune* v. *State*, 9 S. & M. 465; *Pope* v. *State*, 36 Miss. 121; *Caleb* v. *State*, 39 Miss. 721; *Hare* v. *State*, 4 How. 187; *Boles* v. *State*, 13 S. & M. 398; *Cartwright* v. *State*, 71 Miss. 82.

From the foregoing authorities, and especially the Cartwright case, on all fours with the instant case, we cannot see on what ground a hope can be entertained for the affirmance of this case in view of this error. The attorney general cites the case of *Capps* v. *State*, 46 L. R. A. (N. S.) 741, with its annotations, but in all of the cases in the notes to that case, where the article are vicious—and many are less vicious than the instant article—the courts have reversed said cases. Even the

main case he cites, accompanied by these notations, was reversed by the Arkansas supreme court, Chief Justice McCullough dissenting; but he dissented on the ground that the article did not contain a reflection of public opinion against the accused, which the article in the instant case expressly contains, as it states that: ''Mass meetings have been held at Pass Christian to remove Sprinkle from office and the mayor and board of aldermen have sought by legal means to relieve him of his commission, but without success,'' etc.

That the jury obtained the newspaper and read this article was properly proved. This kind of evidence does not fall within the strictness of the rule that jurors cannot testify to impeach their own verdict. *Nelms* v. *State,* 13 S. & M. 500; *Mattox* v. *United States,* 36 L. Ed. (U. S.) 917; *Perry* v. *Bailey,* 12 Kan. 539, 545; *Woodward* v. *Leavitt,* 107 Mass. 453.

Under the authorities in our original brief and in this brief, we say that: (1) This article was of such a nature that the obtaining and reading of it by jurors should reverse this case; and, (2) the obtaining and reading of it was properly proved, under the rule announced by this court in the *Nelms case, supra,* and in the Kansas case of *Perry* v. *Bailey, supra,* and the Massachusetts case, *supra,* followed by the United States supreme court in the *Mattox case, supra,* as the proper rule.

Not only has the *Nelms case, supra,* been approved by jurisdictions outside the state, including the United States supreme court in the case of *Mattox* v. *United States, supra,* but this court in the comparatively recent case of *Shaw* v. *State,* 79 Miss. 577, also, reaffirms and re-approves it. Wigmore lays down the sensible view in his work on Evidence, Vol. 4, pp. 3277, 3278, 3284, 3285.

ANDERSON, J., delivered the opinion of the court.

The appellant was indicted, tried, and convicted of the murder of one Louis Faye, and, the jury having disagreed as to the punishment, he was by the court sentenced to

the penitentiary for life. From which judgment this appeal is prosecuted.

The uncontradicted testimony in the case shows that the deceased, Faye, had been for several hours at the home of a woman by the name of Juanita Thompson; that during the early part of the evening a man by the name of Cruthirds came to this home and was ordered to leave by Faye, who was armed with a pistol. The testimony is conflicting as to whether Faye unintentionally shot off his pistol, or shot at Cruthirds, but at any rate the pistol was fired, and Cruthirds left the house. Cruthirds then called at the place of business of the appellant, who was city marshal of Pass Christian, and, according to the testimony of appellant Cruthirds informed him that Faye had shot at him, and he wanted appellant to arrest Faye. Whereupon the appellant and Cruthirds proceeded to the home of Juanita Thompson. The testimony relating to the shooting is conflicting. The dying declaration of Faye was to the effect that he was getting ready to leave the Thompson home, and had picked up his pistol, and was going out to put it in his car, and that when he was on the front porch the appellant stepped up on the porch and shot him six times before he could say anything; that appellant said nothing to him, but stepped up on the porch and began shooting; that he did not attempt to shoot appellant.

The evidence on behalf of appellant was to the effect that he demanded of Faye that he consider himself under arrest for shooting at Cruthirds, when Faye presented his pistol toward appellant as if to shoot him, and thereupon appellant shot deceased. In other words, appellant's evidence made a case of self-defense while the evidence of the state made a case of murder. The dying declaration of the deceased was testified to by the district attorney to whom it was made. He testified further that Faye's dying declaration was taken down in shorthand by a stenographer, transcribed, and given to him, and that at the time he was testifying he had this copy

in his pocket.   He was asked by appellant's attorney if
Faye's statement was not elicited by the witness asking
him leading questions, the reply to which was, he thought
not.   Appellant's attorney thereupon requested the dis-
trict attorney to let him see the written statement.   This
request was refused, whereupon appellant moved the
court to compel the district attorney to allow him to
see the statement, which motion was overruled.   The
stenographer who took down and transcribed the state-
ment testified that it was correctly taken down and trans-
scribed.   Appellant then again moved the court to re-
quire the district attorney to furnish him the statement.
The motion was again overruled.   This action of the
court is assigned as error.   We are of opinion that the
court should have sustained the motion and allowed ap-
pellant's attorney to examine the statement for use in
cross-examination as well as evidence if competent and
relevant.   The statement was not a private paper in the
ordinary sense belonging to the district attorney.   It was
procured in his official capacity for the purpose of aid-
ing him in the prosecution of appellant.   It is true it was
not a public document or record in the usual sense.   How-
ever, it had a bearing on the question of the guilt of ap-
pellant.   The district attorney admitted that the state-
ment so taken and transcribed was substantially correct.
With this paper before him appellant's attorney might
have been able to convince the jury that the testimony
of the district attorney was inaccurate in some material
respect.

On motion for a new trial the following facts were
shown by members of the jury who convicted appellant.
Arguments in the case were concluded at night.   The fol-
lowing morning, while the jury were at breakfast at a
cafe, two of the jurors bought copies of the Times-Pica-
yune purporting to contain an account of the trial. These
newspapers were taken into the jury room.   We now
quote from the testimony of one of the jurors:

"Before these papers were brought there were ten for
conviction and two for acquittal, and we came to our

room upstairs and talked over the matter a little while, and then it was eleven to one and that was before anything was said about the newspapers. When it stood eleven to one this juror read the paper before he decided on his verdict. After he got through reading it we took another vote on our verdict.''

The article begins on the first page of the paper, it is headed:

''Sprinkle laughs at murder trial; fate in balance.''

The latter part of it reads as follows:

''Sprinkle has figured conspicuously in the court records of Harrison county for the last fifteen months. He first sprang into notoriety when he was charged by the Sellier Brothers with hi-jacking a cargo of liquor valued at fifty thousand dollars from the Mary K off Henderson Point in April of 1923. He was next charged with killing a negro, whom he claimed he was trying to place under arrest and was acquitted on the plea of self-defense, and this was followed not long afterward by the fatal shooting of Faye.

''Mass meetings have been held at Pass Christian to remove Sprinkle from office and the mayor and board of aldermen have sought by legal means to relieve him of his commission, but without success. His salary was at one time greatly reduced, but he still held on. Having been elected by the people, it is contended that he cannot be removed from office until he has been convicted of crime.''

In this article the jury were informed of several matters about which testimony could not have been introduced, namely, of the appellant's being a conspicuous figure in the court records of Harrison county, also of his being charged with hi-jacking a cargo of liquor. We understand that the common term ''hi-jacking'' means the robbery of one bootlegger by another. Also of his killing a negro and pleading self-defense, and also of mass meetings by the citizens of Pass Christian in an effort to remove him from the office of city marshal.

There is no difference between the jury getting this information from a newspaper and getting it from the testimony of witnesses. This was incompetent testimony thrown into the balance, obtained by the jury, probably innocently, though not lawfully. This case comes squarely within the rule announced in the case of *Cartwright* v. *State*, 71 Miss. 82, 14 So. 526, from which opinion we quote the following:

"This method of communicating to and impressing upon the jury, or any member of it, the opinions of others is open to the same condemnation which would be visited upon oral expressions of opinion touching the defendant, injected into the body of the jury by some designing intermeddler. We can see no difference, unless in degree. . . . We know of no reported case in which an outside person has been shown to have talked with the jury, or a member of it, concerning the accused when on trial for a high crime, and especially to have talked unfavorably to and with the jury of the accused, in which the verdict has not been set aside. It seems to us impossible to distinguish between the mischief done by oral and written or printed communications. In every instance in which improper influences have been brought to bear upon the jury there will arise the fear that the accused has not had that fair and impartial trial to which he was entitled."

Before reading this article one of the jurors was for acquittal; almost immediately after reading it he voted for conviction.

The attorney-general contends, however, that the members of the jury were incompetent to prove the purchase and consideration by them of the newspapers containing the article above referred to. He argues that the effect of their testimony was to impeach their own verdict. It is true beyond question that jurors cannot impeach their own verdict. Public policy forbids that a matter resting in the personal consciousness of the jurors should be received to overthrow their verdict. Being personal, such

a matter is beyond the reach of other testimony. It gives to the secret thoughts of the jurors the power to disturb their expressed conclusion in their verdict. Its tendency is to produce bad faith on the part of jurors. Therefore jurors will not be permitted on a motion for a new trial to give evidence as to what influenced their verdict. But testimony by jurors as to the misconduct of others in their presence or hearing—testimony as to outside influences brought to bear upon them—does not fall within that principle. They will not be heard to give evidence as to their own misconduct, but they will be heard to give evidence as to the misconduct of others which is calculated to have a bearing on their verdict. They will not be permitted to testify as to the effect on their verdict of such outside influences, but they will be permitted to testify as to the fact of such influences. This position is amply sustained by authorities both in this state and elsewhere. *Nelms* v. *State,* 13 Smedes & M. 500, 53 Am. Dec. 94; *Shaw* v. *State,* 79 Miss. 577, 31 So. 209; *Mattox* v. *U. S.,* 146 U. S. 153, 13 S. Ct. 50, 36 L. Ed. 917; *Perry* v. *Bailey,* 12 Kan. 539, 545; *Woodward* v. *Leavitt,* 107 Mass. 453, 9 Am. Rep. 49; 4 Wigmore on Evidence, p. 3285. It follows from these views that the jurors were competent to testify to the reading by members of the jury of the newspaper article in question, but were not competent to testify as to the effect thereof upon their verdict. Appellant's motion for a new trial should have been sustained.

On the objection of the state the trial court excluded testimony offered by appellant to the effect that deceased had the reputation of habitually going armed, and also a bad reputation for peace and such character was known to appellant. In a case like this where the question is whether the deceased or the slayer is the aggressor such evidence should be received. *Moriarty* v. *State,* 62 Miss. 654; *King* v. *State,* 65 Miss. 576, 5 So. 97, 7 Am. St. Rep. 681.

Error is assigned to the giving of certain of the state's instructions. Two of these instructions are inaccurate

and incomplete, but their defects were cured by the instructions for appellant.

We find no foundation in the record for the other assignments of errors.

*Reversed and remanded.*

SMITH, C. J. (dissenting).

I am of the opinion that:

1. The evidence of certain jurors as to the purchase and reading by one or more of their fellows of a newspaper containing an article derogatory to the appellant was incompetent, and the court below committed no error in disregarding it. This court's predecessor, the High Court of Errors and Appeals, so held in *Nelms* v. *State,* 13 Smedes & M. 500, 53 Am. Dec. 94, wherein Chief Justice SHARKEY as its organ said:

"The general rule is that a juror shall not be allowed to impeach the verdict by disclosing his own misconduct. . . . or that of his fellows."

And in *Shaw* v. *State,* 79 Miss. 577, 31 So. 209, the case relied on, in the opinion in chief, it was expressly held that—"Jurors may not be heard to impeach their verdict by showing their own misconduct, or what took place in their private room."

The evidence of jurors here held to be competent discloses, not only misconduct "of their fellows," but also "what took place in their private room."

2. The court below committed no error in declining to force the district attorney to turn over to counsel for the appellant the transcribed stenographic notes of the appellant's alleged confession. This transcript had not been approved by the appellant, was not used by any witness in order to refresh his recollection of the confession, and could not have been introduced as evidence of the confession.

3. Conceding the admissibility of the evidence of the deceased's habit of carrying a concealed weapon, but

which I very seriously doubt, it could have been of no value to the appellant here. Such evidence is of value in a case where the deceased was killed because of a hostile demonstration made by him which, when viewed in the light of his habit of carrying a concealed weapon, justified his slayer in thinking the deceased was armed and therefore his life was in danger. But here, according to the evidence both for the state and the appellant, the deceased's pistol was in plain view, and his ability to carry out the hostile demonstration which the appellant claims he made needed no confirmation.

The judgment of the court below should be affirmed.

Holden, J., concurs in this dissent.