McInnis *v.* State.

Mar. 3, 1952.

No. 38373 (57 So. (2d) 137)

R. C. Russell and Billy Little, for appellant.

J. T. Patterson, Assistant Attorney General, for appellee.

Kyle, J.

The appellant, James Boyce McInnis, was convicted in the Circuit Court of Simpson County on a charge of having in his possession intoxicating liquor, and was sentenced to pay a fine of $300 and serve sixty days in the county jail. One-half of the fine and one-half of the jail sentence were suspended during good behavior. From that judgment he prosecutes this appeal.

The State's case was based upon the testimony of the sheriff and evidence procured under a search warrant by a search of the building and premises on which the liquor was found.

The sheriff testified that on December 22, 1950, he obtained a search warrant from the justice of the peace for District No. 1 of Simpson County authorizing the search of the property described as a crudely constructed building and house trailer operated by James McInnis, Bullie Cole and one "Smitty", located approximately 6½ miles south of Magee on Highway No. 49, and that he proceeded immediately to the place described in the search warrant for the purpose of making the search. He was accompanied by two deputies; and when he and his deputies arrived at the place described in the search warrant, he and one of the deputies, whose name was Toney, entered the main building, where he served the search warrant on the man called "Smitty," whom the sheriff knew only as "Smitty." The sheriff and his deputy immediately searched the building and found a slot machine, six cases of beer and about twelve half pints of whiskey. The sheriff testified that he had sent Stewart, the other deputy, to another building located a short distance north of the main building, and that Stewart was not present when the search warrant was served on "Smitty." The sheriff and Toney also found 34 gallons of moonshine or untaxed whiskey in an automobile that was parked about ten or twelve feet from the main building.

The sheriff testified that just as he drove up to the building he saw the defendant, James Boyce McInnis, standing about two or three feet behind the automobile in which the untaxed whiskey was found; that the turtle shell of the automobile was up and that one case of whiskey was on the bumper of the automobile; that the defendant left the place in a hurry and disappeared in the woods south of the building. The sheriff stated further that the automobile in which the whiskey was found was a 1937 Ford automobile, and that it was the defendant's automobile. He was asked how he knew it was the defendant's car, and his reply was "Only seeing him in it. I don't have any record of his ownership of it." The sheriff was asked whether he had had any conversation with the

defendant concerning the case before the trial, and in reply to that question the sheriff stated that the defendant had approached him about a settlement of the case the day before the trial, and in the conversation which the defendant had with him at that time the defendant said, "You know it was my load."

The premises which the officers searched and on which the whiskey was found were generally known as the "Briar Patch."

The defendant, testifying in his own behalf, stated that he had operated the "Briar Patch" up to December 1, 1950, but that he had turned the place over to "Smitty" Smith on that date, and that he had had nothing to do with the operation of the place since that time. He stated that he was not at the "Briar Patch" on December 22, when the officers arrived and made the search. He denied that he owned the 1937 Ford automobile in which the untaxed whiskey was found. He stated that J. C. Johnson, a Negro, who apparently helped operate the colored section of the "Briar Patch", owned a 1937 Ford automobile which he had bought from Ed Berry. He denied that the whiskey which was found by the officers belonged to him. Upon being questioned as to the conversation which he had had with the sheriff on the day before the trial, he stated that he said to the sheriff at that time "I don't have any money to fight the case and I am not guilty, but I wouldn't mind them finding me guilty if the judge would suspend all the charge," and he asked that the sheriff talk to the district attorney and the judge about the matter.

Three other witnesses testified for the defendant that the "Briar Patch" was operated by "Smitty" after December 1. According to the testimony of one of these witnesses, "Smitty" was in Virginia at the time of the trial.

After the jury had returned its verdict the defendant made a motion for a new trial and in his motion alleged as one of the grounds therefor that the sheriff, after the case had been submitted to the jury and while the jury was

considering the same, stated to one of the jurors that he had no beds for the jurors and that they would have to bring out a verdict that night, and that as a result of the sheriff's statement the jury returned a verdict a short time thereafter. The defendant alleged in his motion that the sheriff's statement was highly prejudicial to the defendant, and that a new trial should be granted on that account. The court, after hearing testimony concerning the alleged remarks made by the sheriff to the jurors, overruled the motion for a new trial.

The first point argued by the appellant's attorneys in their brief on this appeal is that the court erred in permitting the State to introduce the affidavit and search warrant and the evidence procured under the search warrant as a part of the State's proof, for the reason that the search warrant did not authorize the search of the 1937 Ford automobile. There is no merit in this contention, however, for the reason that the search warrant authorized a search not only of the building and the house trailer, but also the yard, the garden, the field and woods near the building and the house trailer. The automobile was parked in the yard only a few feet from the building. The turtle shell of the automobile was up, and one case of whiskey was on the bumper of the automobile when the officers arrived. Under these circumstances the officers, in executing the search warrant, had a right to search the automobile and to seize the whiskey found therein even though the automobile was not specifically mentioned in the search warrant. Reynolds v. State, 136 Miss. 329, 101 So. 485; Bradley v. State, 209 Miss. 750, 48 So. (2d) 365.

The appellant next contends that the peremptory instruction requested by him should have been granted for the reason that the proof showed that the appellant had no connection with the operation of the "Briar Patch" after December 1, and that the appellant did not own the 1937 Ford automobile in which the 34 gallons of whiskey was found, and that the proof was in-

sufficient to justify a verdict of guilty. It is true that the appellant and his witnesses testified that the appellant had nothing to do with the operation of the "Briar Patch" during the month of December. But the appellant admitted that he had operated the "Briar Patch" up to December 1. And the sheriff testified that the appellant and Bullie Cole and "Smitty" were operating the place during the month of December. The sheriff testified further that when the officers arrived at the "Briar Patch" on December 22 to make the search he saw the appellant standing two or three steps behind the automobile in which the 34 gallons of whiskey was found; and the sheriff testified that the appellant had stated to him the day before the trial that "You know that load was mine." This testimony, if believed by the jury, was sufficient to justify the jury in finding the appellant guilty; and the court committed no error in refusing to grant the peremptory instruction.

The appellant next contends that the court erred in refusing to grant the following instruction which was requested by the defendant: "The Court instructs the jury for the defendant, James Boyce McInnis, that the burden of proof is on the State to prove beyond a reasonable doubt that the defendant on December 22, 1950, had the whiskey in question as found in the automobile, in his possession and unless the jury believes beyond a reasonable doubt that the defendant did so have said whiskey in his possession on said date it will be your sworn duty to find the defendant not guilty."

But we think that the court committed no error in refusing to grant the instruction. If the jury believed from the evidence the "Smitty" was operating the place for the appellant, the jury would have been warranted in finding the appellant guilty of having in his possession the twelve half pints of whiskey found in the building, as well as the 34 gallons of whiskey found in the automobile parked in the yard at the west end of the building.

Finally, the appellant contends that the court erred in overruling the defendant's motion for a new trial because of the alleged misconduct of the sheriff in stating to the jury, after the case had been finally submitted to the jury, that they would have to bring out a verdict that night for the reason that there were no beds available for the jurors to sleep on.

The court conducted a full hearing on the charge made against the sheriff for the purpose of determining whether he had made any statement to the jury that was calculated to influence their verdict. The record shows that about two hours after the case had been submitted to the jury the jurors made known to the court that they desired to have additional instructions. The court, with the approval of the district attorney and the defendant's attorneys, directed the sheriff to inform the jury that the court could give them no additional instructions. The sheriff then went to the jury room door and delivered the judge's message. There is some conflict in the testimony as to what took place immediately after the sheriff delivered the judge's message. Three members of the jury who were called by the defendant to testify on the motion for a new trial testified that when the sheriff delivered the judge's message he told the jurors that he had no beds for them to sleep on and that they would have to bring out their verdict that night. One of the three jurors testified in answer to a direct question put to him by the defendant's attorney that the sheriff's statement influenced his verdict. The other two jurors stated that the sheriff's remarks had no influence on them.

The sheriff testified that, when he opened the jury room door and delivered the judge's message, a member of the jury asked him, ''Where am I going to sleep?'' And the sheriff stated that his reply was that the beds were in order but that he did not have enough pillows. The sheriff's testimony about the matter was corroborated by the testimony of two or three of the other jurors. One juror testified that he did not hear anything said

about the matter. The bailiff testified that he was present when the sheriff delivered the judge's message, and that he did not hear the sheriff make any remark about the beds or about the jury bringing out a verdict that night. The janitor testified that the beds in the jury dormitory were kept in order during the term of the court, but that he was short three pillows.

We think that the action of the trial judge in overruling the motion for a new trial was proper. The facts presented to us in the record that we now have before us are wholly unlike the facts presented in the cases of Lewis v. State, 109 Miss. 586, 68 So. 785, and May v. State, 98 Miss. 584, 54 So. 70, which are cited by the appellant's attorneys in their brief. The sheriff testified that the statement complained of was made by him in answer to a question asked by one of the jurors. The statement was not such a statement as might be calculated to influence a jury in arriving at a verdict; and the statement seems to have made little impression on the jurors. Two or three versions of the statement were given by the jurors who testified during the hearing on the motion. Only one of the jurors claimed that the sheriff's statement had any influence on his verdict, and his testimony on that point was clearly incompetent.

It is well settled that jurors cannot impeach their own verdict by testifying as to the motives and influences which affected their deliberations. As stated by this court in the case of Sprinkle v. State, 137 Miss. 731, 102 So. 844, 845, ''Public policy forbids that a matter resting in the personal consciousness of the jurors should be received to overthrow their verdict. Being personal, such a matter is beyond the reach of other testimony. It gives to the secret thoughts of the jurors the power to disturb their expressed conclusion in their verdict. Its tendency is to produce bad faith on the part of jurors. Therefore jurors will not be permitted on a motion for a new trial to give evidence as to what influenced their verdict.'' Jurors, on a motion for a new trial, may testify as

to the misconduct of others in their presence or hearing, or as to outside influences brought to bear upon them. But their testimony as to these matters should be limited to the facts relating to such misconduct or outside influence. They should not be permitted to testify as to the effect of such misconduct or outside influence on their verdict, or as to the motives that prompted them to vote for the verdict. Shaw v. State, 79 Miss. 577, 31 So. 209; Sprinkle v. State, supra; Mattox v. United States, 146 U.S. 140, 149, 13 S. Ct. 50, 36 L. Ed. 917; Woodward v. Leavitt, 107 Mass. 453, 9 Am. Rep. 49.

There is no reversible error in the record, and the judgment of the lower court is affirmed.

Affirmed.

**Roberds, Hall, Lee** and **Ethridge, JJ.,** concur.