290 So.2d 202

**Houston SNIDER, Jr.**

**v.**

**STATE.**

**I Div. 425.**

Court of Criminal Appeals of Alabama.

Oct. 30, 1973.

Rehearing Denied Dec. 4, 1973.

W. J. Causey, Jr., Monroeville, for appellant.

William J. Baxley, Atty. Gen., and David Lee Weathers, Asst. Atty. Gen., for the State.

ALMON, Judge.

Houston Snider, Jr., was convicted of murder in the second degree and sentenced to thirty years in the penitentiary.

Appellant admitted the killing but relied on self-defense. The only question presented is whether the appellant should have been permitted to testify that he knew Bennie Lee Andrews, the deceased, carried a gun in his truck.

The killing occurred at the home of appellant and his common-law wife and her children. He had been living there with her for approximately eight years.

The testimony was in conflict but the appellant's version of the occurrence was that he returned home "about night" to find the deceased present, along with his common-law wife, Dimple Pugh, Dimple's daughter, Marlene Pugh, and other members of the family. He testified that when he arrived he told the deceased to leave. It is inferable from the record that the deceased was visiting either the appellant's common-law wife or her daughter. The appellant testified as follows:

"Q. Where were you when you first spoke to Bennie Lee?

"A. We was out there in the yard.

"Q. Bennie Lee came out in the yard?

"A. Yes, sir, he come out there in the yard and I told him—I said, 'I thought I told you to leave,' and he told me he would whip my damn ass—

"Q. What did he say?

"A. He said he would whip my damn ass and I told him he was a damn lie—

"Q. Wait now—let me ask you the question and you answer it. Did you see Bennie Lee's truck parked down here in front of the house?

"A. Yes, sir.

"Q. Do you know whether Bennie Lee carries a gun—

"MR. KIMBROUGH: We are going to object to that, Your Honor.

"THE COURT: I sustain that.

"Q. You saw Bennie Lee's truck out there?

"A. Yes, sir.

"Q. Out in front of the house?

"A. Yes, sir, out in front of the house.

"Q. You were talking to Bennie Lee right here (indicating)?

"A. Yes, sir.

"Q. And what did he say to you?

"A. He told me he would whip my damn ass and I told him he was a damn lie —

"Q. Wait a minute. You went in the house?

"A. Yes, sir.

"Q. And then what did he do?

"A. He went to his truck.

"Q. Did you have any lights on in the house?

"A. No, sir, we didn't have none on.

"Q. Were there any lights on outside the house?

"A. No, sir.

"Q. Was it dark on the outside?

"A. Yes, sir, it was dark.

"Q. There has been some testimony about an argument with your wife. Did you have an argument with your wife?

"A. Yes, sir, she did.

"Q. Did your daughter—did Marlene get involved in this argument?

"A. Yes, sir, after me and her was arguing, I was kinda straddling her but I never did hit her.

"Q. You didn't hit your wife?

"A. No, sir, I was just holding her and she took some scissors and stabbed me.

"Q. Marlene stabbed you?

"A. Yes, sir.

"Q. What did you tell Bennie about this time? Where was he?

"A. He was standing at the door.

"Q. Bennie was standing at the door?

"A. Yes, sir.

"Q. All right. What did you do then?

"A. He went to the truck.

"Q. Did you say anything to him?

"A. Yes, sir, I told him to go home.

"Q. Had you ever seen Bennie before this time?

"A. That day?

"Q. Had you seen him before? Did you know Bennie Lee Andrews?

"A. Yes, sir, but we hadn't never been into it—

"MR. KIMBROUGH: We are going to object.

"THE COURT: Yes. Gentlemen of the jury, the last part of that answer is not for your consideration.

"Q. What did Bennie Lee Andrews do then after he went to his truck?

"A. I told him to get back. I was scared and I shot him.

"Q. And he came up?

"A. Yes, sir, he come up to the door steps and that is when I shot him.

"Q. What did you do?

"A. I told him to get back.

"Q. Were you scared of him?

"MR. KIMBROUGH: We object.

"THE COURT: Sustain it. That's for the jury.

"Q. Did you believe he had a weapon?

"MR. KIMBROUGH: We object to that, Judge.

"THE COURT: Sustain it.

"Q. Did Bennie Lee Andrews make any response when you told him to leave?

"A. He didn't leave.

"Q. What did he do?

"A. He went to his truck. I wasn't shooting to kill him.

"MR. KIMBROUGH: We object to that —to any voluntary statement.

"THE COURT: Yes, I sustain it. Just answer the question and don't volunteer anything.

"Q. Where was Dimple about this time that this took place? Was she in the house?

"A. Yes, sir, she was but she said she left. She said she was outdoors.

"Q. And where was Marlene?

"A. In the door I think

"Q. What did you do when you fired the shot?

"A. After I fired the shot, I run.

"Q. Which way did you run?

"A. In the woods.

"Q. Did you take the gun with you?

"A. Yes, sir.

"Q. Houston, you said you have known Bennie Lee Andrews for a while. You had known him for some time before this night?

"A. Yes, sir.

"Q. What kind of work did you do?

"A. What kind of work?

"Q. Yes, what did you do?

"A. Paperwood—I helped Jimmy Hinson and Buster Watson.

"Q. What sort of work did Bennie Lee Andrews do?

"A. Paperwood.

"Q. He had his own crew?

"A. Yes, sir.

"Q. Have you ever worked in the woods with him?

"MR. KIMBROUGH: We object to that.

"THE COURT: I'll let him answer that question.

"Q. Did you ever work in the woods with Bennie Lee Andrews?

"A. Yes, sir, I have worked with him.

"Q. Are you familiar with Bennie Lee Andrews' truck and his operation?

"A. Sir?

"Q. Do you know about what Bennie Lee Andrews had in his truck?

"MR. PEARSON: We object to that.

"THE COURT: I sustain that as to what Bennie Lee Andrews had in his truck.

"Q. Houston, did you come back in the house after you shot and ran?

"A. Sir?

"Q. After you shot and ran, did you come back to the house that night?

"A. No, sir, not all the way back to the house.

"Q. Did you stay in the woods?

"A. Yes, sir.

"Q. Until they found you out there?

"A. Yes, sir. I was scared.

"MR. KIMBROUGH: I'm going to object to that, Judge, and move to exclude it.

"THE COURT: Yes, I will exclude the last statement the witness made. That is not for your consideration.

"Q. Houston, did you have some reason to be frightened of Bennie Lee?

"MR. KIMBROUGH: We object to that, Judge.

"THE COURT: I sustain the objection.

"MR. CAUSEY: We reserve an exception.

"Q. Houston, did you know Bennie Lee Andrews carried a gun in his truck?

"MR. KIMBROUGH: We object to that, Judge.

"THE COURT: Yes. Mr. Causey, I have sustained objections to about two or three of those questions. Don't ask that again.

"MR. CAUSEY: No more questions."

The theory of the defense was that the appellant shot the deceased under the honest apprehension that he was in imminent peril of life or limb. Under these circumstances, it was relevant whether appellant knew the deceased was in the habit of carrying a gun.

The rule is stated in Clinkscale v. State, 37 Ala.App. 593, 73 So.2d 244:

"'* * * the general rule is that, where the evidence tends to show that accused might have acted in self-defense, evidence is admissible to show that deceased was in the habit of carrying firearms or other deadly weapons or that he had the reputation of habitually being armed. It must, of course, be made to appear that such habit or reputation of deceased was known to the accused, as otherwise it could not have influenced his conduct, and evidence showing such knowledge is admissible'. 40 C.J.S., Homicide, § 272d, p. 1225. See also Wiley v. State, 99 Ala. 146, 13 So. 424; Naugher v. State, 116 Ala. 463, 23 So. 26; Cawley v. State, 133 Ala. 128, 32 So. 227; Degro v. State, 34 Ala.App. 232, 38 So.2d 354; Sprinkle v. State, 137 Miss. 731, 102 So. 844; People v. Allen, 378 Ill. 164, 37 N.E.2d 854; Kinder v. Commonwealth, 263 Ky. 145, 92 S.W.2d 8; Gibson v. State, 176 Ga. 384, 168 S.E. 47."

The judgment is reversed and the cause remanded for new trial.

Reversed and remanded.

All the Judges concur.

