531 So.2d 1215 (1988)
James L. STOOP
v.
STATE of Mississippi.
No. 58041.
Supreme Court of Mississippi.
October 5, 1988.
Billy N. Owen, Langston & Langston, Booneville, for appellant.
*1216 Edwin Lloyd Pittman and Mike Moore, Attys. Gen. by Harrison S. Ford, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before ROY NOBLE LEE, C.J., and SULLIVAN and ZUCCARO, JJ.
ZUCCARO, Justice, for the Court:
James L. Stoop was indicted by the Grand Jury in Prentiss County on February 13, 1984 for the murder of Marvin C. Williams. Stoop was arraigned on February 15, 1984 at which time he pled not guilty. Stoop went to trial on February 19, 1985; however, the jury was unable to reach a verdict and the trial ended in a mistrial on February 21, 1985. On November 2, 1985, the second trial also ended in a mistrial due to the jury's inability to reach a verdict. However, on October 1, 1986, Stoop was found guilty by a jury and sentenced to life in custody of the Mississippi Department of Corrections. Stoop appeals assigning the following as error:
I. THE TRIAL COURT ERRED IN NOT GRANTING A NEW TRIAL BASED UPON THE FACT THAT JUROR, ALLEN MOORE, DID NOT REVEAL TO THE COURT AND TO THE ATTORNEY FOR THE DEFENDANT THAT HE WAS PRESENTLY INVOLVED IN A CRIMINAL CASE STILL PENDING IN THE CIRCUIT COURT OF PRENTISS COUNTY.
II. THE TRIAL COURT ERRED IN NOT GRANTING A MISTRIAL UPON THE STATE'S ATTORNEYS STATING TO THE JURY THAT THEY SHOULD "MAKE THEM PROVE FACTS TO YOU AND NOT EMOTION".
III. THE TRIAL COURT ERRED IN ALLOWING INTRODUCTION OF THE PROJECTILE WHICH CAUSED THE DECEASED'S DEATH OVER THE OBJECTION OF THE DEFENDANT.
IV. THE COURT ERRED IN GRANTING INSTRUCTION NOS. S-1A AND S-2A TO THE JURY.
V. THE TRIAL COURT ERRED IN REFUSING TO GRANT INSTRUCTION D-1 TO THE JURY.
VI. THE TRIAL COURT ERRED IN REFUSING TO GRANT THE ISSUANCE OF THE PROPOSED INSTRUCTION D-3 TO THE JURY.
VII. THE TRIAL COURT ERRED IN REFUSING TO GRANT PROPOSED JURY INSTRUCTION NOS. D-4 AND D-5.
VIII. THE TRIAL COURT ERRED IN EXCLUDING EVIDENCE CONCERNING WHETHER OR NOT THE DECEASED HABITUALLY CARRIED A WEAPON AND THAT THE DEFENDANT HAD THIS KNOWLEDGE PRIOR TO THE SHOOTING.
IX. THE TRIAL COURT ERRED IN ALLOWING THE READING OF THE TESTIMONY OF KAREN HEATHCOCK FROM PRIOR TRIALS INTO THE RECORD WITHOUT THE STATE PROVING THAT SHE WAS UNAVAILABLE TO TESTIFY.
X. THE TRIAL COURT ERRED IN NOT GRANTING A NEW TRIAL TO THE APPELLANT PURSUANT TO HIS MOTION FOR NEW TRIAL WHICH WAS FILED AFTER THE VERDICT WAS RENDERED.
We find assignments IV, VIII, and IX to have merit. Finding no merit in the other assignments of error we discuss only assignments of error IV, VIII and IX.

STATEMENT OF THE FACTS
This case involves adultery, fornication, mental cruelty and ultimately death. However, the death was not that of an innocent victim but of a man having an adulterous affair with the wife of appellant and then tormenting him by dangling the affair beneath the husband's nose. The grand finale in this scenario of sins was the fatal shooting of Marvin C. Williams (Charlie *1217 Williams), the lover of Norma Stoop, by James L. Stoop, Norma's husband.
James L. Stoop (Jimmy Stoop) was tried for the third time and finally convicted of murder by a jury on October 1, 1986 and sentenced to life in prison. The record on appeal, a fit transcript for a trashy soap opera, reveals the following sordid facts:
Norma Stoop and Jimmy Stoop were married on August 16, 1958. They had two children, Tim, twenty six at the time of trial, and Angela, twenty at the time of trial.
In August of 1983, Jimmy Stoop moved out of his and Norma's bedroom into the den due to the deterioration of their marriage. After he moved into the den, Jimmy Stoop began to receive phone calls from Charlie Williams. Charlie said things such as, "Well, you ole bastard, are you still married to your television set? Bastard do you know where your wife is?" These phone calls occurred about five times from the time Jimmy moved to the den until October 12th, the day before the shooting. Jimmy testified that he heard laughing in the background and that his wife was never home during the times he received the phone calls.
Jimmy testified that he confronted his wife, Norma, on October 6, 1983 about her affair with Charlie Williams. Norma admitted to having the affair and said she intended to continue with the affair. Jimmy pleaded with Norma to discontinue the affair, to no avail.
Norma Stoop's usual routine was to come home at 4:00 in the afternoon from work to change clothes and leave not to return sometimes until after midnight.
Both Angela Stoop, daughter of the Stoops and Jimmy Stoop, on different occasions, had ridden past Charlie Williams' house to find Norma's car parked there.
On October 12, 1983, Jimmy and Angie were at home together when Jimmy decided to call Charlie at work to ask Charlie to quit seeing Norma Stoop. Charlie became belligerent and commented that he was going to continue seeing Norma Stoop but that he wanted to meet Jimmy Stoop somewhere. Charlie said, "I will talk to you, I will do more than talk." Jimmy Stoop tried to get Charlie Williams to meet him at Hobo Station, a store in Booneville. Charlie refused, saying, "There are too many people there. Like I told you before, we have a Hell of a lot more to do than talk." Charlie told Jimmy Stoop to meet him on Mt. Pisgah road by four o'clock that day. Angela Stoop testified that she was sitting next to her father so she could hear the conversation and Angela's testimony was corroborative of Jimmy Stoop's testimony. Jimmy did not meet Charlie Williams because Norma Stoop talked him out of it. Norma told her husband "If you won't go, I will come in at four o'clock and we will talk." Norma allegedly called Charlie Williams and called off the relationship; however, when Norma came home the talk between Norma and Jimmy did not go well so she got dressed and went to Charlie's house.
The next day, October 13th, Jimmy Stoop went to the police chief, Bobby Lambert, to inform the police chief that he had been threatened by Charlie Williams. The police chief informed Jimmy that Charlie Williams was known to carry a gun. Jimmy Stoop asked the police chief if it were legal to carry a gun. The police chief told Jimmy that it was legal to carry a long gun such as a shot gun or rifle, but illegal to carry a hand gun. Jimmy returned to his home after meeting with the police chief and received a phone call from Charlie Williams. Charlie wanted to know why Jimmy did not meet him at Mt. Pisgah road the day before. Jimmy agreed to meet Charlie that day at Mt. Pisgah road. Instead, however, Jimmy went to the school where Charlie was teaching.
Jimmy testified that he wanted to talk to Charlie in a public place because he was afraid Charlie would hurt him if they met in a private place. Jimmy did not want to disrupt the school and was afraid that would be the result if he went into the building, so Jimmy rode through the parking lot hoping to see Charlie outside since Charlie was a bus driver and the school day was over. Not seeing Charlie or Charlie's truck, Jimmy drove to the Hobo Station *1218 hoping that Charlie would drive past there on his way to Mt. Pisgah road and stop. Jimmy felt that a confrontation there would be safer and less likely to result in harm than a confrontation on a secluded highway. Charlie did not show up. Jimmy decided to go home.
While driving toward his home he saw Charlie Williams pulled off the side of the road standing outside the truck. When Jimmy pulled up Charlie reached inside the truck and pulled out what Jimmy testified was a gun. Seeing this, Jimmy took a rifle out of his car. Charlie then stood behind his truck door apparently to take cover. Charlie eased around the front of the truck and dropped out of sight. Jimmy asked Charlie to come out from behind the truck. When Charlie refused Jimmy shot over the truck to let Charlie know he had a gun. Jimmy testified that Charlie Williams began moving around to the passenger's side of his truck. Jimmy was afraid that Charlie was attempting to position himself to fire his gun at Jimmy. Jimmy again asked Charlie to come out from behind the truck so he could see his hands. Charlie did not come out so Jimmy fired a shot through the truck window. Charlie was still outside of the truck and hiding. Jimmy testified that he was attempting to back up to get back in his car to leave when he saw Charlie open the truck door and crouch. Jimmy feared that Charlie was trying to get a long gun out of the truck so he fired one last round into the tailgate of the truck which penetrated the back of the truck cab and then hit Charlie Williams in the back. Jimmy testified that he fired this round to keep Charlie from reaching for another gun but that he only fired into the truck because he didn't see Charlie in the truck. Jimmy testified that he could not see Charlie's head or body in the truck window and was unaware that Charlie had crawled into the truck. Jimmy left the scene and drove for several hours allegedly to clear his head and think matters out.
Charlie Williams was hit by the third round fired through the tailgate of the truck. Charlie died two and one-half weeks later. Jimmy was indicted for murder. Jimmy had been tried two times prior to the trial which is the subject of this appeal. Both trials ended in mistrials because the jury could not reach a verdict. Other facts will be incorporated herein where necessary.

DID THE TRIAL COURT ERR IN GRANTING INSTRUCTION NUMBERS S-1A AND S-2A TO THE JURY?
Instruction S-1A, given by the trial court, reads as follows:
The defendant, JAMES L. STOOP, has been charged by an indictment with the crime of Murder for having, with malice aforethought, killed Marvin C. Williams. If you find from the evidence in this case beyond a reasonable doubt that the deceased, Marvin C. Williams, was a living person, and the defendant, JAMES L. STOOP, did wilfully and with malice aforethought kill Marvin C. Williams, without authority of law, then you shall find the defendant, JAMES L. STOOP, guilty of Murder.
If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant not guilty.
Instruction S-2A, also given by the trial court, reads as follows:
The Court instructs the Jury that every killing of a human being without authority of law and not in necessary self-defense, is either Murder or Manslaughter; Murder when done with malice aforethought and Manslaughter when done without malice aforethought in the heat of passion and not in necessary self-defense. Thus, if you believe from the evidence in this case beyond a reasonable doubt that the defendant, JAMES L. STOOP, killed Marvin C. Williams, without authority of law and not in necessary self-defense with his malice aforethought then in that event you should find the defendant guilty of Murder as charged. In the event you believe from the evidence in this case beyond a reasonable doubt that the defendant killed Marvin C. Williams without authority of law and *1219 not in necessary self-defense without malice aforethought and in the heat of passion then in that event you should find the defendant guilty of Manslaughter.
If the State has failed to prove any one or more of these elements beyond a reasonable doubt, then you shall find the defendant not guilty.
We held in Smith v. State, 463 So.2d 1028 (Miss. 1984) that the giving of these identical instructions was error because they were contradictory to each other. They are contradictory in that S-1A omits any reference to self-defense whereas S-2A sets forth self-defense. We determined in Smith that the jury would have to decide which of the instructions correctly portrayed the law, a function of the court, not the jury.
Smith is controlling in the case sub judice and mandates that we reverse and remand on this assignment of error.

DID THE TRIAL COURT ERR IN EXCLUDING EVIDENCE THAT THE DECEASED HABITUALLY CARRIED A WEAPON?
During direct examination of appellant the following questions and answers were before the jury:
Q. Now, you testified that after Mr. Williams dropped his arm down into the cab of the truck, he came up with what appeared to be a black or blue steel pistol?
A. Yes, sir.
Q. Now, did that surprise you that he was armed?
A. No, I knew he was armed, and had been since Jimmy Williams shot him for breaking up his family.
BY MR. REEDY:
Object to that, Your Honor.
BY JUDGE WICKER:
Objection sustained. And the jury is admonished to disregard that statement.
BY MR. LANGSTON:
I didn't even hear it, Your Honor.
BY JUDGE WICKER:
I did, and the jury is admonished to disregard it. Objection sustained.
James Stoop argues he should have been allowed to put on evidence that the victim, Charlie Williams, habitually carried a gun and had a reputation for violence in the community.
The Comment to Miss.Rules of Evidence 404(a)(2) states:
Ordinarily a victim's character is irrelevant. The fact that a "bad" man rather than a "good" man was murdered or beaten is inconsequential. Spivey v. State, 58 Miss. 858 (1881). Under specific circumstances, however, the character of a victim may be relevant. This would most likely arise in instances where the defendant claims that the victim was the initial aggressor and that the defendant's actions were in the nature of self-defense. In order to prove this the defendant must offer evidence of an overt act perpetrated against him by the victim. Freeman v. State, 204 So.2d 842 (Miss. 1967). Having proved the act, the defendant may then offer proof of the victim's character. Shinall v. State, 199 So.2d 251 (Miss. 1967), cert. denied 389 U.S. 1014 [88 S.Ct. 590, 19 L.Ed.2d 660] (1967), outlined the permissible exceptions which would still be applicable under this rule. The recognized exceptions are: "(A) when, from the circumstances of the case, it is a part of the res gestae; ... (B) where the evidence of the homicide is wholly circumstantial . ..; (C) where it is doubtful as to who the aggressor was at the time of the homicide ...; or (D) where the immediate circumstances of the killing render it doubtful as to whether or not the act was justifiable." (Emphasis added)
As early as 1888, the Mississippi Supreme Court has held that it is for the jury to determine whether or not appellant had reasonable cause to apprehend danger to his life or limb at the time of the killing. Testimony that the deceased habitually went armed with concealed weapons and that the appellant was cognizant of this fact should be admitted to enable the jury to determine whether there was a reasonable *1220 cause to apprehend danger. Admission of such evidence will enable jurors to put themselves in the place of the appellant at the time of the killing, and view the situation as it appeared to him. King v. State, 65 Miss. 576, 5 So. 97 (1888).
In Sprinkle v. State, 137 Miss. 731, 102 So. 844 (1925) this Court held that in a case where the question is whether the deceased or the slayer is the aggressor, evidence to the effect that the deceased had the reputation of habitually going armed should be received into evidence. Moriarty v. State, 62 Miss. 654 (Miss. 1885). See also Smith v. State, 182 Miss. 890, 183 So. 699 (1938).
After carefully reviewing this record it is apparent to this Court that Charlie Williams repeatedly threatened Stoop with bodily harm. Stoop's inability to present these threats as well as the fact that Williams habitually carried a gun seriously impaired Stoop's self-defense argument and prevented the jury from being able to ascertain the true state of mind of the defendant. We reverse and remand based upon this assignment of error.

DID THE TRIAL COURT ERR IN ALLOWING THE STATE TO ADMIT INTO EVIDENCE THE DEPOSITION OF KAREN HEATHCOCK WITHOUT PROVING THAT SHE WAS UNAVAILABLE TO TESTIFY?
When the State attempted to read into evidence the transcript of testimony of one of its chief witnesses, Karen Heathcock, given during a previous trial on the same cause, the defense objected.
The record on appeal reflects that a subpoena was issued for Karen Heathcock on August 27, 1986. However, no subpoena was issued to Michigan where Karen was living. On September 25, 1986 the State filed its notice of intent to use transcribed testimony. The trial in the case sub judice took place from September 29th until October 1, 1986. During the trial, Bobby Heathcock, Karen's estranged husband, testified that he had known his wife's whereabouts for approximately three to five weeks and that she was living in Grand Blanc, Michigan. The record reflects that a call was made by the district attorney's office to Bobby Heathcock's home while Heathcock was out-of-town. Oddly enough, instead of calling at a later date when Heathcock returned home, the district attorney talked to Heathcock's girlfriend and took her word that she did not know where Karen Heathcock was at that time. The trial court overruled the defense's motion to exclude Heathcock's deposition.
The defense refused to concede that Heathcock was unavailable within the terms of Rule 804 of the Mississippi Rules of Evidence and did restate its objection to the admission of the transcribed testimony. The defense pointed out that there were serious discrepancies between the testimony of Karen Heathcock at the first trial and the testimony of Heathcock at the second trial.
James Stoop argues that the admission of the transcribed testimony of Karen Heathcock was a violation of his right to due process. This Court agrees.
Miss.R. of Evid. 804(a)(1), (2), (3), (4) and (5) prescribe the situations in which a witness is unavailable to testify. If the declarant is unavailable pursuant to Miss.R. of Evid. 804, former testimony is not excluded by the hearsay rule.
We find that the State failed to prove that it satisfied the requirement that Karen Heathcock was unavailable as a witness as mandated by Rule 804(a)(5) which states:
(5) Absence of the witness from the hearing accompanied by an inability of the proponent of the evidence to compel the witness' presence is within the definition of unavailability.
There was evidence that Bobby Heathcock was aware of his estranged wife's whereabouts at least three weeks prior to the trial. The State satisfied itself that Karen could not be located after speaking to Bobby Heathcock's girlfriend. We are not satisfied with this effort. The State did not make a diligent effort to locate Karen Heathcock; therefore, the requirement of unavailability is not met.
*1221 The Confrontation Clause of the United States Constitution operates in two separate ways to restrict the range of admissible hearsay. First, in conformity with the Framers' preference for face-to-face accusation, the Sixth Amendment establishes a rule of necessity. In the usual case, including cases where prior cross-examination has occurred, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. The second aspect operates once a witness is shown to be unavailable; reflecting its underlying purpose to augment accuracy in the fact finding process by ensuring the defendant an effective means to test adverse evidence, the clause countenances only hearsay marked with such trustworthiness that there is no material departure from the reason of the general rule. Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980). (Emphasis added)
According to United States v. Barlow, 693 F.2d 954 (6th Cir.1982):
In determining to what extent the Confrontation Clause permits the introduction of evidence which fits within one of the recognized exceptions to the rule against hearsay, courts have sought to balance the right of the defendant to have live testimony presented against him and the interest of the government in ensuring effective law enforcement. For admission of such evidence, the Confrontation Clause requires that the hearsay declarant be unavailable and that the evidence possess "adequate indicia of reliability." Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception; in other cases, the evidence must be excluded, unless there is a showing of particularized guarantees of trustworthiness. Moreover, the "circumstantial guarantees of trustworthiness" required by Rule 804(b)(5) are not equivalent to the "particularized guarantees of trustworthiness" required under the Confrontation Clause; thus, evidence of reliability may not be inferred under all exceptions to the rule against hearsay (including Rule 804(b)(5)). (Emphasis added)
Karen Heathcock's testimony during the second trial was in serious conflict with her testimony in the first trial. There was no "indicia of reliability" as is required by the Confrontation Clause and illustrated by Ohio v. Roberts and United States v. Barlow, supra. Therefore, in weighing Stoop's right to have live testimony presented against him against the State's interest in ensuring effective law enforcement, Stoop wins. We hold the transcribed testimony should have been excluded, if not because the State failed to make a diligent effort to procure Karen Heathcock's appearance to testify, then for violation of the Confrontation Clause of the Sixth Amendment.
We reverse and remand this case for a new trial based upon several valid assignments of error, to-wit: IV, VIII, and IX.
REVERSED AND REMANDED.
ROY NOBLE LEE, C.J., HAWKINS and DAN M. LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN, ANDERSON and GRIFFIN, JJ., concur.