589 So.2d 637 (1991)
Calvin DAY
v.
STATE of Mississippi.
No. 90-KA-0108.
Supreme Court of Mississippi.
November 6, 1991.
Sam N. Fonda, Lott Franklin Fonda & Flanagan, Greenwood, for appellant.
Mike C. Moore, Atty. Gen., Wayne Snuggs, Asst. Atty. Gen., Jackson, for appellee.
En Banc.
BANKS, Justice, for the Court:

I
Here we are confronted with the question of whether it is error to exclude evidence of prior threats made by a homicide victim to the accused where the accused takes the position that the ultimate shooting was accidental but the prior threats have bearing on the issue of whether the result was manslaughter or murder. Because the difference between murder and manslaughter is measured by the perpetrator's state of mind it is essential that an accused be allowed to introduce probative evidence of all of the surrounding circumstances which may be fairly thought to have a bearing on his state of mind. Because Calvin Day was deprived of that opportunity, we reverse and remand.

II
The Leflore County Circuit Court indicted Calvin Day on October 12, 1989, for the murder of J.B. Johnson. On December 7, 1989, a jury returned a verdict of guilty, and the court sentenced Day to life imprisonment in the Mississippi State Penitentiary. There is little dispute about the facts.
About dusk on August 16, 1989, J.B. Johnson, Otha Watkins, Greg Littleton, Charles Bowie and Ronnie Tabor were riding *638 around Greenwood in Otha Watkins' car. They intended to play basketball at a local park, but by the time they arrived there it had become too dark to play. After proceeding to a near-by convenience store, where they purchased a twelve-pack of beer, the group drove to the Broad Street Park.
While stopped on Broad Street, Calvin Day and his companion, Lincoln Austin, drove up in Watkins' truck. Day was a self-employed mechanic and had been repairing Watkins' truck. He stopped to explain to Watkins the repairs that he had made and what remained to be completed.
At some point during the discussion about the truck, Johnson began to taunt Day with statements such as, "you be screwing people ... out of their money all the time, I guess you are fixing to screw Otha out of some more now." All the witnesses confirmed that Day tried to walk away from Johnson, but every time Day would turn away Johnson would grab his arm and turn him around or jerk him back. Johnson said, "I am going to show you that I ain't no punk and you can't run over me." Further testimony revealed that Johnson "walked up on him [Day], told him, said `we're going to find out right now who the best man is,' and so he pointed a finger in Calvin's face ... Calvin pushed his hand back out of his face again and then ... J.B. [Johnson] hit him, hit him beside his head."
This fight began when Johnson struck Day, and although Day returned the lick, testimony indicates that Johnson not only instigated the fight, but also passed the first lick. Each exchanged a blow before one of the men separated them. When Johnson picked up what Austin believed to be a brick, Austin led Day to the truck to leave. During the fight, Johnson cut Day's ear with what Day believed to be a knife, but which Johnson said was his key ring.
Bowie testified that, before leaving, Day told Johnson to "be there" when he returned. On cross examination he stated that he felt no immediate threat or danger from this remark and that he felt that the altercation was over. Watkins testified that he was quite close to Day during and after the altercation and that Day made no such remark.
After the men were separated, Johnson, Watkins, Tabor, Bowie and Littleton left the park and drove to Tabor's house which was located nearby. According to Day, he and Austin left the park intending to meet Watkins at his house. They proceeded to Austin's home to pick up another car which Day was going to drive, and Austin was going to follow him in the truck to Watkins' house. Watkins was going to drive the truck overnight to check it out. Because Watkins was not at home, however, they did not leave the truck and, upon leaving Watkins's home, Day and Austin were separated.
The car Day picked up at Austin's was a small gray car which belonged to another customer. Day testified that he had driven the car to Memphis earlier in the week to pick up some parts and supplies and had put a .22 caliber pistol in the glove compartment. He had not yet removed it from the car. While Johnson and his companions watched an unrelated altercation between Tabor's neighbor and the neighbor's girlfriend, Day pulled up to the intersection of Elm Street and Avenue H in front of Tabor's house in the gray car. What occurred next is in some dispute.
Watkins and Tabor testified that they could not see Johnson because he had gone around the corner of Elm and Avenue H toward Short Ash Alley. They stated that they did see Day get out of his car with a pistol in his hand, point down the street, and shoot one time.
Littleton, who had never met Day before the incident on Broad Street earlier, testified that he saw Johnson run toward, or in the direction of, Day at the intersection, but then turn and start down Avenue H. He, like Watkins and Tabor, saw Day fire the pistol once in the direction of Johnson.
Day testified that Johnson ran toward his car, and upon seeing Johnson coming toward him, he grabbed the gun and exited the car. Upon exiting the car he heard someone yell "he's got a gun." Day did not know whether it was Johnson or himself to whom the person was referring. He *639 added that he intended to fire in the air to scare Johnson off, but the safety was on and while fumbling with the safety the gun went off, firing in the direction of where Johnson had been. Other witnesses testified to hearing Day say something about the safety before the gun went off. Day's single shot struck Johnson in the back and traveled through the aorta valve to the heart, killing Johnson almost immediately.
When Day drove around to the alley to see where Johnson had gone and found him lying face down in the alley, he returned to tell Johnson's companions. No weapon was found on Johnson, only a key ring with a fingernail file. Day went to the police station where he turned himself in with the gun.
The altercation on August 16, 1989, was only one of many such meetings between Day and Johnson. According to testimony Johnson had disliked Day from their first meeting which occurred soon after Day moved to Greenwood two or three years earlier. Johnson took every available opportunity to convey to Day his dislike of him. There had been numerous difficulties with and increasing threats from Johnson prior to the shooting. Although the defense attempted to introduce evidence through the testimony of Day and witnesses, the trial court sustained the State's objections to the evidence and excluded the testimony.
Watkins testified that just a few months prior to the shooting, Johnson chased Day with a "box-cutting" razor but his testimony was cut-off by the State's objection. The exclusion of the following proffered testimony serves as the basis for Day's appeal.
Day's proffered testimony included the following:
Q. All right, what did he say when he threatened you?
A. Well you know he would be talking about what he gonna do to me, said he was gonna cut me with this razor and so on and so on. Every time ...
Q. Well what ...
A. Every time I see him, you know, wherever I be at, in public or whatever, you know he come to me with the same thing, talking about what he gonna do to me.
Q. Had this gone on over a long period of time?
A. It being going on, like I said, about at least two or three years, but, see, I had been ... he had been disappearing and I didn't see him that much until I started ... 'til I started back running with Otha.
Q. All right.
A. And then he came back with the same situation every time I seen him.
Q. And that  was he threatening to cut you with a razor all the time?
A. Everytime I seen him he was talking about doing something to me.
Q. All right. Now had he made these threats recently; and I mean when I say recently, were they in close proximity to the day of the shooting on August the 16th?
A. Right, he did. He told a friend guy of mine, said "When I say [see] Calvin, I ain't gonna say nothing to him, just gonna walk up to him and cut him in the face with this razor."
Q. Who did he tell that to?
A. He told that to Otha Watkins, then Otha Watkins proceeded and came back and told me.
.....
Q. All right, now, you say that razor; had he ... you ever seen that razor before?
A. Yes, he pulled it on me once before.
Q. All right, where did he pull it on you?
A. We was at a store down there by ... on Bowie Lane named Speedway. Me and him got into a little dis-scuffle ... a little scuffle; and after my uncle told us to stop, we just stopped, and J.B. walked off from me and I seen him take the razor out and he clicked the razor. And then he started coming toward me so I just took off running around the store.
.....

*640 Q. All right, now, did you know of your own mind whether or not he carried a razor with him ...
A. Yes.
Q... . most of the time?
A. Yes.
Q. How did you know that?
A. Because he worked with Otha and they use it every day.
Henry Day testified to the following outside the hearing of the jury:
Q. Are you familiar with the ... with J.B. Johnson, or do you recall an incident at the One Stop on Highway 7 when J.B. Johnson pulled a razor on your nephew, Calvin?
A. Yeah. I remember that because I came up about the time.
Q. All right. Did he chase him around the store with the razor?
A. Yes, he did.
Q. All right. Had you heard later and generally was it street talk that he was going to cut Calvin's face with that razor?
A. Yes, I did.
Q. That was pretty much known on the streets ...
A. Yeah, that's ...
Q... . among y'all?
A. Yeah.
Q. Was J.B. known to carry a razor?
A. Yeah, a box cutter type razor, yeah.
Finally, the court recalled Otha Watkins to allow Day to make a proffer of testimony regarding Johnson's prior threats.
Q. Is it true that for a long time J.B. Johnson had been threatening and starting in on Calvin Day about different things?
A. Well mostly every time ... every time they meet, you know, they be arguing and stuff like that, you know, and ...
Q. Had J.B. threatened him before?
A. Well, you know, they got ... got into it one day at the One Stop on No. 7 highway shooting pool and so he got ... picked up a stool at him that day, you know, and so like ... That's about all I know.
Q. Did he pull a razor on him one time?
A. Yeah, he pulled a razor on him the day at the One Stop Center when they got into a little tussle down there.
Q. What kind of razor was that that he pulled?
A. It was a box cutter.
Q. Box cutting razor?
A. Yeah.
Q. Did he chase him with that razor?
A. Yes, he chased him around the store with it.
Q. Did he later tell you, he being J.B., that he was going to cut Calvin in the face with that razor?
A. Yeah, when he was ... when we be, you know, we got and we left there and was on the way home and he said in the car that ... said, "He think he done got away, but I'm gonna get him," you know. He said, "When I see him again I'm gonna walk right up to him and cut him in the face."
Q. And did you tell Calvin that he told you that?
A. Yeah, I tell him, I told him, I said, "You better look out for him," because he had said that ... you know that he was gonna cut him with that razor and I didn't want to see neither one of them get hurt.
.....
Q. All right. Did you know J.B. to carry that razor on him on a regular basis?
A. Well he generally keep it ... keep it with him all the time, you know, because he use it ... he use it at work.
Day offered this testimony to explain that the shooting was not premeditated murder. Day chose to use the testimony that Johnson had made previous threats against him and that Johnson was known to carry a razor to support his defense to the indictment for murder, and that he did not have the requisite state of mind at the time of the shooting to constitute premeditated murder.

*641 III
The State objected to Day's proffer on the basis of Rule 404(a)(2) of the Mississippi Rules of Evidence claiming that Day failed to lay the proper foundation for self-defense. The State asserted that the evidence of Johnson's prior threats and the evidence that he was known to carry a dangerous weapon was character evidence of the victim.
The Rule does not explicitly limit such evidence to the issue of self-defense. "Evidence of a pertinent trait of character of the victim of the crime offered by the accused" is an exception to the general prohibition against character evidence. Rule 404(a)(2). If we are compelled to classify the evidence offered as "character" evidence, the question remains whether it is "pertinent" or relevant to some issue to be resolved.
The purpose of admitting the evidence was not to demonstrate the victim's character for violence or peacefulness in the community, nor to demonstrate Day's knowledge of any particular character trait of Johnson for violence or peacefulness in the community, nor that Johnson acted in conformity with any particular character trait. Rather, Day offered the testimony to demonstrate the relationship between himself and Johnson, and to explain why their personal relationship would have caused him to panic or act irrationally at the time of the shooting. Therefore, the Rule 404(a)(2) exception to the general prohibition against the use of character evidence applies.
More specifically, however, this is evidence of other acts offered for the purpose of proving something other than the victim's character. That is, it is evidence of prior acts offered as having a bearing on the accused's state of mind, an essential factor in determining whether a homicide is manslaughter or murder. It is therefore admissible under Rule 404(b).
Rules 404(b) and 405(b) of the Mississippi Rules of Evidence create the threshhold requirement for admissibility of the type evidence in question. Once satisfied, the proponent must then comply with the relevance rules. See, U.S. v. Beechum, 582 F.2d 898, 911 (5th Cir.1978)[1]. There is little doubt that evidence of Johnson's prior harassments, threats and assaults against Day, offered to demonstrate Day's state of mind at the time of the shooting, clears the first hurdle under Rules 404(b) and 405(b).
The second and more difficult hurdle for Day deals with relevance, defined by Rule 401 as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Miss. R.Evid.Rule 401. Rule 403 provides for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Miss.R.Evid.Rule 403.

IV
Determining the relevance of the testimony would be a simple task had Day claimed that the shot was fired in self-defense. Day stated that he was not presenting a claim of self-defense but "something close to self defense." A self-defense argument is quite plausible from the factual scenario despite the fact that the defense elected against utilizing it. The record indicates that both Day and Littleton testified that Johnson ran toward Day while Day was in the car in front of Tabor's house. Johnson's alleged prior *642 threats and harassments and the fact that he always carried a weapon could easily serve as the foundation for establishing the reasonable apprehension of severe bodily harm that Day would need to claim self defense, as a motivation for grabbing the pistol. The implicit assertion that the initial actions were in self defense supports Day's contention that the actual firing was accidental.
As early as 1888, this Court held that determining whether or not a defendant had reasonable cause to apprehend danger to his life or limb at the time of a killing is a factual inquiry to be left to the jury. King v. State, 65 Miss. 576, 5 So. 97 (1888). Evidence of a victim's prior threats against a defendant and evidence of a victim's habitual possession of a weapon should be admitted to enable the jury to determine whether there was a reasonable cause to apprehend danger. Id. Admitting such evidence enables jurors to put themselves in the defendant's place at the time of the killing and view the situation as it appeared to him. Id.
The Court in Stoop v. State, 531 So.2d 1215 (Miss. 1988), cited King, in reversing a decision which convicted the defendant of murder and sentenced him to life imprisonment. Id. The Court held that the trial court seriously impaired the defendant's self-defense argument and prevented the jury from being able to ascertain the true state of mind of the defendant when it refused to admit evidence of the victim's prior threats against the defendant and the fact that the victim habitually carried a gun. Id. at 1219-20.
Since King, the Court has made it clear that where any doubt exists as to who was the aggressor in an incident which results in the death of a participant or where a defendant claims self-defense, evidence of a deceased's previous threats and harassments against defendant, and even testimony that deceased habitually carried a weapon, is admissible. Gates v. State, 484 So.2d 1002, (Miss. 1986); Brown v. State, 464 So.2d 516, 520 (Miss. 1985); Amis v. State, 204 So.2d 848, (Miss. 1968); Freeman v. State, 204 So.2d 842 (Miss. 1967); Smith v. State, 182 Miss. 890, 183 So. 699 (1938); Sprinkle v. State, 137 Miss. 731, 102 So. 844, (1925).

V
Day argued that he sought to have the evidence admitted to explain his state of mind at the time of the incident. The jury's determination of whether Day was guilty of murder, manslaughter, or not guilty at all, hinges substantially on Day's state of mind. Johnson's prior threats against Day, at a minimum, affect the probability that the events occurred as Day believed, and thus, are relevant to support his defense.
We wrote in Nicolaou v. State, 534 So.2d 168 (Miss. 1988), that it "has always been the law in this state that the unexplained proof that the defendant killed another with a deadly weapon authorized a jury find malice and convict of murder." Id. 172 (citations omitted) (emphasis omitted). The Court held that a "killing with a deadly weapon may be susceptible of clear explanation by the accused or eyewitnesses as an accident, or justified as having been committed by the accused acting in lawful self-defense, or mitigated manslaughter. When no such proof is forthcoming the jury is warranted in finding the accused guilty of murder." Id. But see, Yates v. Evatt, 500 U.S. ___, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991); Francis v. Franklin, 471 U.S. 307, 105 S.Ct. 1965, 85 L.Ed.2d 344 (1985).
In Lee v. State, 160 Miss. 618, 134 So. 185 (1931) we expanded the permissible use of prior threats beyond claims of self-defense.
[w]e think the condition of the defendant's mind, at the time of the fatal shooting is important in the case at bar in determining whether the killing was malicious and wilful, or with malice aforethought, or whether justifiable, and if not justifiable, was done under a mistaken belief, honestly and entertained, as bearing on the question of possible manslaughter. If the previous conduct of the deceased was, as testified to, hostile, it would constitute a situation highly provocative *643 in its nature, and such conduct on repetition, was calculated to highly exasperate and inflame the mind of the ordinarily reasonable man. It is well known that there is a marked difference between the effect of an act when accompanied by previous provocation and one not so accompanied. Men, at best are fallible and frail beings, and where there is a persistent effort to provoke a difficulty by one person against another, the mind reacts with violence, although it is the mind of an ordinarily prudent and reasonable man.
The Comment to Rule 404(a)(2) provides that
[o]rdinarily a victim's character is irrelevant.... Under specific circumstances, however, the character of a victim may be relevant. This would most likely arise in instances where the defendant claims that the victim was the initial aggressor and that the actions were in the nature of self-defense. In order to prove this [victim was initial aggressor or defendant's actions were in nature of self-defense] the defendant must offer evidence of an overt act perpetrated against him by the victim. Freeman v. State, 204 So.2d 842 (Miss. 1967).
Miss.R.Evid. 404(a)(2) comment (emphasis added).
The Comment also cites Shinall v. State, 199 So.2d 251 (Miss. 1967), for the exceptions which would be permissible under this rule.
The recognized exceptions are: "(A) when from the circumstances of the case, it is a part of the res gestae; ... (B) where the evidence of the homicide is wholly circumstantial ...; (C) where it is doubtful as to who the aggressor was at the time of the homicide ...; or (D) where the immediate circumstances of the killing render it doubtful as to whether or not the act was justified."
Id.
Miss. Code Ann. § 97-3-17 defines excusable homicide in part as "(b) When committed by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation." Id. After an instruction is received by the Court it is for the jury to decide what constitutes "accident" or "misfortune" or "sudden and sufficient provocation."
Here, Day had an explanation to offer to mitigate the murder charge to manslaughter.[2] Although the court gave a manslaughter *644 instruction to the jury, the court denied Day the opportunity to present the evidence which might support that instruction. Whether or not the evidence itself was convincing is not for this Court to decide but rests in the province of the jury. Without all the facts and circumstances surrounding the shooting, the jury was handicapped in determining what really occurred, and Day was prejudiced by any decision that resulted. The jury was free to find Day guilty of murder, or of the lesser offense, or of no offense at all. However, Day had a right to present all the relevant facts for the jury to consider.

VI
Though relevant, if the probative value of the evidence of Johnson's threats were substantially outweighed by any unfair prejudice, confusion of the issues, misleading of the jury or other considerations mentioned in Rule 403, then the trial court would have been correct in excluding the evidence, despite the State's incorrect objection. That is not the case. Any potential prejudice would have occurred only if the jury had misinterpreted the testimony to be evidence of the evil character of Johnson. However, the probative value of the evidence to Day, clearly, outweighs any prejudice to the victim that might have arisen. Additionally, any possible prejudice to the State from aspersions on Johnson's character could have been cured by a limiting instruction.

VII
We hold that the trial court erred in excluding Day's proffered testimony regarding Johnson's prior threats and assaults against him. Such evidence was relevant to show Day's state of mind at the time of the incident. Therefore, this case is reversed and remanded for a new trial.
REVERSED AND REMANDED.
HAWKINS and DAN M. LEE, P.JJ., and ROBERTSON and SULLIVAN, JJ., concur.
ROY NOBLE LEE, C.J., dissents with separate written opinion joined by PRATHER and McRAE, JJ.
HAWKINS, P.J., concurs in part and dissents in part with separate written opinion.
PITTMAN, J., not participating.
ROY NOBLE LEE, Chief Justice, dissenting:
In my opinion, the conviction of Calvin Day for the murder of J.B. Johnson should be affirmed and I dissent from the majority opinion reversing and remanding the case for a new trial.
On the night of August 16, 1989, there was one encounter between Day and Johnson early in the evening and approximately twenty minutes later, after arming himself with a .22 caliber revolver and apparently looking for Johnson, Day found Johnson with friends, and shot him in the back while Johnson was unarmed and running from Day.
*645 Day does not claim self-defense nor does he specifically claim an accident although he did testify that the gun "went off". The majority reverses because testimony of previous altercations and threats by Johnson against Day were excluded. The reversal is strictly on the basis of showing Day's "state of mind" at the time of the shooting. We have been cited to no law, statute, rule or case law, nor has any been found to support such a decision under the facts in this case.
About 8:00 p.m. on the night of August 16, 1989, Johnson and Day came together at Broad Street Park in Greenwood, Mississippi. Johnson was riding around town with four of his friends and stopped near the park. Day and his companion drove up in the truck of one of Johnson's friends. Johnson and Day apparently had no love for each other and Johnson, with a key ring in his hand, struck Day on the head. The ring nicked Day's ear. Thereupon, Day returned the blow, hitting Johnson on the head. Their friends separated the two men and both groups went their own ways.
The Johnson group went to the home of Tabor, a companion, located at the intersection of Elm and Avenue H. Day and his friend, Austin, went to Austin's home where Day had parked a customer's car. Day got into the car, which he knew contained his revolver in the glove compartment. About twenty minutes after the altercation at the park, Johnson was standing on the corner of Elm and Avenue H. when Day drove to the middle of the intersection, skidded to a halt, got out of the car with the revolver in his hand and went around the car.
At the sight of Day, Johnson ran around the corner of Elm and down Avenue H. away from Day. No words were exchanged between Day and Johnson, who fled down Avenue H. toward Short Ash Alley. Day gripped the revolver with both hands, pointed the pistol toward the fleeing Johnson, aimed, and said, "Damn, the safety's on". He released the safety and fired once at the fleeing Johnson. The bullet struck Johnson in the back, passed through Johnson's left lung and heart causing his speedy death. Day got back into his car, drove to the alley where he checked to see, if Johnson was still breathing, and returned to the Elm Street corner and told Johnson's friends where Johnson was lying. They found him at the spot, dead and unarmed.
The testimony of the State's witnesses corroborated each other. Excerpts from that of one witness follows:
Q. Okay. All right, then did Calvin Day come up?
A. Yes, he drove up right up under the intersection of Avenue H. and Elm Street.
Q. Did he park next to y'all's car, or did he park down the street, or where?
A. He was right up under . . he was right at the intersection.
Q. How far away from the car were y'all?
... .
Q. About twenty feet?
A. Yeah, about that far.
Q. And where was J.B. Johnson?
A. Well after Calvin pulled up, J.B. started running.
Q. When Calvin pulled up... ... All right, did he... . . When did he... ... . Exactly when did he start running, when he pulled up and stopped, or when he was pulling up, or what?
A. Well when he was coming up, I guess J.B. knew whose car it was so he broke and started running.
Q. And in what direction did he run and down what street?
A. He ran down H., going South.
Q. Did you see him running down H.?
A. I seen him turning the corner running.
Q. Turning the corner and turned left and take off down H.?
A. Right.
Q. Before he started running, did he say anything at all to Calvin Day?
A. No.
Q. Did Calvin Day say anything to J.B. when he got out of the car or when he was inside the car?

*646 A. No, when he jumped out the car and J.B. was running that's when he went around the car and got the pistol.
Q. Now let me ask you. Which side of he car did he get out on?
A. The driver's side.
Q. The driver's side. And when you say he... ... Tell me about this jumping out of the car; how did he do that?
A. Well he stopped and  you know how you driving fast and you stop in a hurry, you hit a brake skid.
Q. All right.
A. And then he jumped out real fast 'cause J.B. had took off to running.
Q. Okay. And then he have to walk around the car to get . . to go toward Avenue H.?
A. No. Yeah, yeah, the way he was coming. He came down H. Yes, he had to walk around the car.
Q. And when did you see the pistol in his hand, at what stage of all this happening?
A. Well when he came around in the car and J.B. was running, he had the pistol and he brought it up and he tried to fire it, but it clicked. He had the safety on it.
... .
Q. Okay. All right, If you would, hold that like . . like Calvin  if you'd point it to the ceiling, but hold it like Calvin Day was holding it.
A. He had both hands on it.
Q. All right. Now  He had both hands on it like that?
A. Yes.
Q. All right. Do you know whether or not he had it cocked or not, or could you tell?
A. I couldn't really tell but he tried to shoot it and it clicked, so he said the safety was on it.
Q. I mean he said that?
A. Yeah.
Q. Okay. And you heard it?
A. Right.
Q. All right. And when he  Who was he pointing it toward, where was he pointing it?
A. He was pointing it in the direction J.B. had ran.
Q. Okay. And how exactly did he say the safety's on? I mean he didn't just... ...
A. No. Well when he was shooting it, it clicked.
Q. All right.
A. He said, "Damn, the safety's on," and he did something, I guess, and knocked it off.
... .
A. Huh? Yeah, he looked at it and did something to it and pointed it back down the street.
Q. And pointed it back?
A. Yeah.
Q. And then what happened?
A. He shot it and it went off.
Q. Okay. You can have a seat.
A. (The witness returned to his seat in the witness box)
Q. What  After it went off, what did he do?
A. He jumped in his car and he left. He went around the corner.
Q. Did he say anything to y'all?
A. No, he just took off down the street real fast and went around the block.
Q. Which way was he going in his car when he took off?
A. He turned down Elm Street.
Q. He didn't turn Avenue H.?
A. No, he turned down Elm Street and made a right on Avenue I.
Q. And how long was it before you saw him again, or did you?
A. Yes, he came back about five or ten minutes later and told us to go around there in the alley and check on J.B., said he was laying down in the alley, and we all ran around there. He was laying down.
(T. 110-115)
Evidence of previous threats and altercations are admissible where, at the time of the fatal encounter, the defendant claims self-defense. It is admissible to show who was the aggressor or to show identity or motive. The defendant must first show that the victim committed some overt act *647 immediately before the fatal shooting. Shinall v. State, 199 So.2d 251, 257 (Miss.), cert. denied, 389 U.S. 1014, 88 S.Ct. 590, 19 L.Ed.2d 660 (1967); Fisher v. State, 481 So.2d 203, 225 (1985); Guice v. State, 60 Miss. 714, 723-25 (1883); Spivey v. State, 58 Miss. 858 (1881).
The rule is not followed, and does not apply in the case at bar. The appellant, Day, does not even plead self-defense. Throughout voir dire and the entire trial, Day asserted he was not claiming self-defense at the time of the actual shooting. Identity and motive were not issues. This sound principle of law has always prevailed in homicide cases, since the beginning of jurisprudence in this State, until this decision. The principle mandates it is not that a defendant thought his own life was in danger when he took life, but whether a reasonable person acting under the same or similar circumstances would have taken the victim's life. The state of Day's mind at the time of the fatal shooting could only have shown malice.
Even though the trial judge excluded the proffered testimony of previous threats and altercations, and correctly so, in my opinion, a great deal of similar testimony was put before the jury by Day and other witnesses. Certainly, everything that occurred at Broad Street, twenty to thirty minutes before the fatal shooting, was before the jury. The trial judge granted a lessor included offense instruction of manslaughter. The jury heard the testimony of all the witnesses mentioned here and others in addition. The jury rejected the claim of the appellant, Day, that he was justified in killing Johnson because of what had happened before. He didn't claim that he had a right to kill Johnson because of anything that happened at the corner of Elm and Avenue H. streets.
In my opinion, the majority has committed grave error in reversing the judgment of the lower court, and I strenuously dissent.
PRATHER and McRAE, JJ., join this opinion.
HAWKINS, Presiding Justice, concurring in part; dissenting in part:
When one man slays another, his state of mind at the time becomes material, because the state of his mind grades the character of the slaying: murder, manslaughter, lawful self-defense, or accident.
The only person who can inform the court of his state of mind at the time of the killing is the defendant himself. While the jury may not be required to accept his statement, the defendant, at least, should be held to what he tells the court and jury was in his head when he inflicted the fatal wound. Also, unless or until the defendant informs the court what his intention was at the time, there is no way of knowing whether background evidence will corroborate his defense or be totally irrelevant. Day was not entitled to put on proof that the victim Johnson was a mean person, or that he was afraid of him, unless or until he showed it offered some defense to the slaying.
There were four possible states of mind in Day's head when he pulled the trigger that day:
1. He intended to shoot Johnson.
2. He intended to shoot Johnson, but out of a fear that he was about to lose his own life or suffer serious bodily harm from Johnson.
3. He accidentally pulled the trigger.
4. He intended to pull the trigger, but only to frighten Johnson, not to shoot him.
We need not wonder what was in Day's head when he pulled the trigger. He told the court and jury:
Q. Did you mean to shoot J.B. Johnson?
A. No, the only thing I had, I said well let me scare this guy off of me, you know, because, like, you know, I said I was gonna shoot in the air. In my mind I was saying let me shoot in the air or something and scare J.B. off of me 'cause, see, I'm just tired of him bothering me 'cause every time I see him he was always talking about what he gonna to do me, son, you know this and that, and I was just, you know, tired and scared and frustrated, you *648 know, and it all happened so fast. And then I proceeded after the gun didn't go off.
.....
... there was some kids, so on and so on, so I was thinking, you know, at that time, you know, so when I did point the gun, the gun didn't go off and so I was just fumbling around with the gun. That's when I said, "Damn, the safety on," just like that, and I was fumbling with the gun and the gun went off.
As Chief Justice Lee points out, the majority misapprehends settled law on when a homicide defendant may lawfully claim self-defense. Day shot Johnson in the back when he was running away. This was not a case of self-defense, regardless of previous threats, because at the time Day shot Johnson, by no stretch of the imagination was he either actually in or could he have reasonably considered himself in imminent danger or serious bodily harm. Wadford v. State, 385 So.2d 951 (Miss. 1980); Bright v. State, 349 So.2d 503 (Miss. 1977); Yarber v. State, 230 Miss. 746, 93 So.2d 851 (1957); Chester v. State, 216 Miss. 748, 63 So.2d 99 (1953). Self-defense is predicated upon a reasonable fear of what is about to happen to you now, not next week, tomorrow, or even thirty minutes from now.
By Day's own testimony this obviously was not a case of self-defense, and he was not entitled to offer evidence of prior threats and altercations on this basis.
Nor is this a case of accidentally pulling the trigger as the majority suggests. Day intended to fire the weapon.
The trial record or the law removes (2) and (4), leaving only (1) and (2), that Day intended to shoot Johnson as the State charged, or (4) he intended to fire the weapon but not to physically harm Johnson. On this last contention, Day was entitled to show the jury the reason why he wanted to simply frighten or warn Johnson. For this purpose he was entitled to introduce the fact of previous threats and altercations, but not the details. Hardy v. State, 143 Miss. 352, 108 So. 727 (1926); Rich v. State, 124 Miss. 272, 86 So. 770 (1921).
Furthermore, with this defense the State was entitled to an instruction to the jury that even if they believed Day did not intend to shoot Johnson, but only to scare him by firing the weapon, this would not under the law exonerate Day, but only reduce the crime from murder to manslaughter. Mullins v. State, 493 So.2d 971 (Miss. 1986); Smith v. State, 463 So.2d 1028 (Miss. 1984); Barnett v. State, 232 Miss. 208, 98 So.2d 656 (1957); Anderson v. State, 213 Miss. 439, 57 So.2d 169 (1952).
NOTES
[1] In Jenkins v. State, 507 So.2d 89, 92-93 (Miss. 1987), we recognized this view of the rules, stating "[t]o be sure, evidence admissible under Rule 404(b) is also subject to the prejudice test of Rule 403... . Unfortunately, we also made conflicting assertions earlier in that opinion. These were inadvertent. Rules 401, 402 and 403 are general rules governing relevance and prejudice and apply to all evidence, whether or not such evidence meets the specific requirements of other evidentiary rules. That is, once evidence has been shown to comply with the standards for admissibility prescribed in other rules it must still be found relevant, as defined in Rule 401, to be admitted, Rule 402, and it is still subject to the objection that its prejudicial effect outweighs its probative value. Rule 403.
[2] Q. Where in the car was the gun?

A. It was in the glove compartment.
Q. And that's the same .22 that they've been waving around here today?
A. That's the same one.
Q. All right. Go ahead, I'm sorry.
A. And so we proceeded to Otha's house. Otha wasn't there so me and Lincoln pulled out the yard. I got  Lincoln got separated from me so I drove straight ahead. I thought Lincoln was behind but Lincoln said when the two cars got in between us he didn't know which way I went. I went straight and Lincoln took a right, and so when I got up there on the corner that's when I seen Otha Watkins' car and all them was standing on the outside when I got up there.
Q. Where were they standing?
A. They were standing on the side . . on the side of Ronnie Tabor's house, Ronnie Tabor's house. That's on Elm Street.
Q. Who all was standing there?
A. It was Otha and Ronnie and what's this . . the tall guy, Greg, I can't think.
Q. All right.
A. They was standing up there and I seen J.B. He was on the corner over there. So by that time, when I drove up there I let. . I started letting the window down in the car to call Otha over to the car to say . . you know to tell him about his truck. By that time I went to letting the window down that's when Johnson rant to my car. He running to my car real fast, you know, so I was fumbling letting the window, and so then I proceeded and got ... .
Q. What did . . what did you think he was doing then?
A. I don't know. You know, like I said, I knew he had that razor and I wasn't going to let him cut me in the face just like that, you know, and so I just . . I was shaking and scared and I didn't know what he had got, like I said, 'cause we had been gone like right at about fifteen or twenty minutes at the most and I didn't know where he was really until he came . . till he come running up to the car, 'cause, see, I pulled up there in the car and watched him through the car.
Q. What happened then?
A. Okay, then I proceeded and I got the gun out the glove compartment. I got out with the gun in the air. I got out with the gun in the air and by that time Johnson had took off. The only thing I knew that Johnson had ran. When I got out of the car, the lady said, she said, "Shit, he's got a gun," just like that. I didn't know who she was talking about so I didn't fire the gun.
Q. Had you ever fired that gun before?
A. Never. I didn't even know anything about the gun.
Q. Were you scared?
A. Yes.
Q. Did you mean to shoot J.B. Johnson?
A. No, the only thing I had, I said well let me scare this guy off of me, you know, because, like, you know, I said I was gonna shoot in the air. In my mind I was saying let me shoot in the air or something and scare J.B. off of me 'cause, see, I'm just tired of him bothering me 'cause every time I see him he was always talking about what he gonna do to me, son, you know this and that, and I was just, you know, tired and scared and frustrated, you know, and it all happened so fast. And then I proceeded after the gun didn't go off... .
Q. Did you know whether or not you had shot him when you fired the gun?
A. No, I didn't, I didn't, 'cause it was dark. It was real dark and, see, I can't see a long distance. I'm nearsighted, I can't see the long distance, because, see, I didn't know where he was, you know. The only thing I heard about a lady saying he got a gun, just like  there was some kids, so on and so on, so I was thinking, you know, at that time, you know, so when I did point the gun, the gun didn't go off and so I was just fumbling around with the gun. That's when I said, "Damn, the safety on," just like that, and I was fumbling with the gun and the gun went off.