CHANDLER, J.,
 

 for the Court.
 

 ¶ 1. Nathaniel Walden was tried for and convicted of the crimes of murder and shooting into an occupied dwelling. For the crime of murder, the Circuit Court of Holmes County sentenced Walden to life in the custody of the Mississippi Department of Corrections. For the crime of shooting into an occupied dwelling, the circuit court imposed a sentence of ten years in the custody of the Mississippi Department of Corrections, with five years suspended and on probation, with the sentence to run consecutively to the life sentence. The court also ordered Walden to pay restitution in the amount of $4,500 to the Crime Victims’ Compensation Fund and to pay court costs and the fees of his court-appointed counsel.
 

 ¶ 2. Walden appeals, arguing that: (1) the trial court erred in permitting a law enforcement officer to testify about Walden’s prior statements; (2) the trial court erred by criticizing defense counsel in the presence of the jury; (3) the trial court erroneously refused Walden’s proffered jury instruction D-2; (4) the verdict was against the weight of the credible evidence and was the product of the jury’s bias and passion; and (5) he received a fundamentally unfair trial as the result of cumulative error.
 

 ¶ 3. We find Walden’s issues to be without merit. Therefore, we affirm his conviction and sentence.
 

 FACTS
 

 ¶ 4. Walden was convicted of shooting and killing his sister-in-law, Mary Walden (Mary). Walden was one of several siblings who lived near each other in Holmes County. Mary resided with Walden’s brother, James Walden (James), and their six children in a trailer house on a one-acre parcel of land. James’s sister, Mattie Brown, lived next to James.
 

 ¶ 5. The events that culminated in Mary’s death arose from difficulties between Walden and James. Walden stored his logging truck on James’s property. Approximately two weeks before Walden shot and killed Mary, James’s son removed a battery from Walden’s truck. Walden confronted James about the missing battery; James punished his son and told Walden to remove the truck and Walden’s other belongings from his property. Consequently, Walden parked his truck down the street, a short distance from James’s property. On April 28, 2005, the day of the shooting, Walden discovered that James’s son had taken a saw out of the truck. Walden went to James’s property, where James and his toother, Benjamin Walden (Benjamin), were working in the yard. Walden confronted James about the missing saw. According to James, Walden became belligerent and would not leave the property, so James forced Walden off the property by pointing an unloaded shotgun at his neck.
 

 ¶ 6. James testified that Walden drove to Brown’s house, but returned fifteen or twenty minutes later with a pistol. James and Benjamin were still working in the yard. James said that Walden fired one shot that struck the ground about six feet away from James’s foot. At that point,
 
 *20
 
 James ran into the trailer house; Benjamin ran away. James testified that Walden began shooting into the trailer house. When Walden stopped shooting, James got his shotgun and fired one shot out the front door. Then, Walden “jumped into his truck and took off.”
 

 ¶ 7. James checked on Mary and discovered her lying in a pool of blood in the doorway between the master bedroom and the bathroom. She was dead. According to the autopsy report, Mary died from a single bullet to the head, which passed out of her body. A bullet was found in the bathroom. The Mississippi Crime Laboratory determined that this bullet came from a pistol which Walden had at the time of his arrest later that day. Also, the pistol contained six spent cartridges that the crime laboratory determined to have been fired in the pistol. There were four bullet holes in the side of the trailer house.
 

 ¶ 8. Brown testified that her house is very close to James’s property. She stated that on the day of the shooting, she witnessed James and Walden arguing in James’s yard about the saw and the land. Then, Walden came to her house; he was angry. Brown testified that when Walden left her house, he said, “I’m going to kill that m-f-.” He then walked up the hill back to James’s property. From her house, Brown witnessed Walden pull out a gun. Brown dropped to the floor to protect the baby she was holding and heard several gunshots. After the shooting, Brown called 911.
 

 ¶ 9. James’s neighbor, Walter Thomas, provided testimony corroborating that of James and Brown. Thomas testified that while he was sitting in his yard on April 28, 2005, he witnessed James and Walden arguing at James’s house. Thomas testified that Walden left and went to Brown’s house, returning to James’s house a few minutes later. Thomas saw Walden shoot at James, causing James to duck down behind a parked car. Then, James went inside the trailer house, and Walden began shooting at the trailer house before leaving in his truck. Thomas stated that he never saw James with a gun during this incident. Thomas related that he was two or three hundred feet away when he observed the shooting.
 

 ¶ 10. On the day of the shooting, Walden was arrested, and after waiving his rights, he gave a statement at the sheriffs department to Chief Deputy Sheriff Roosevelt March and to Captain Sam Chambers. The statement was tape-recorded; a transcript of the statement was admitted into evidence. Walden’s statement conflicted regarding who fired the first shot. Walden said that he fired the first shot, that James fired the first shot, and that James had held the shotgun on him first during the initial argument, which prompted Walden’s return wielding the pistol. When asked if he fired the first shot after he returned to James’s' property with the gun, Walden responded, “yeah.” When asked how many times he shot at James before James went inside to get his gun, Walden stated, “I shot one time. When he came back out there he shot at me. That’s when I emptied my gun[.] I wanted to get in my truck. He shot at me two times.” Walden stated that James shot at him twice, which prompted him to shoot through the trailer house five times. Walden stated that he personally fired a total of six shots.
 

 ¶ 11. Walden testified at trial. Walden testified that he kept the pistol with him at all times. He testified that before the shooting, he went to James’s property, but he departed after James put a shotgun to his neck. He went to Brown’s house and stayed there for fifteen or twenty minutes. He said that when he returned to James’s property, James shot at him, so he fired
 
 *21
 
 one shot into the air. On cross-examination, Walden disavowed his statements to the deputies that he had fired six shots in all. Walden testified that the deputies had put words into his mouth during the interview, and that actually he had only fired one shot into the air after James shot at him. He explained that the spent casings inside the pistol were left there after he went hunting. However, upon further questioning, Walden stated that he was running away and shooting into the air, so he did not know how many rounds he had fired into the trailer house. Walden maintained throughout his testimony that he never intended to kill anyone.
 

 ¶ 12. On Count I, the charge of deliberate-design murder, the court instructed the jury on the elements of deliberate-design murder, of culpable-negligence manslaughter, and the theory of self-defense. The jury found Walden guilty of murder. Walden was also found guilty of Count II, shooting into an occupied dwelling. He does not challenge the conviction for Count II in this appeal.
 

 LAW AND ANALYSIS
 

 I. WHETHER THE TRIAL COURT ERRED IN ALLOWING INTO EVIDENCE THE HEARSAY STATEMENTS OF THE DEFENDANT THROUGH CHIEF DEPUTY ROOSEVELT MARCH, OVER THE DEFENSE’S OBJECTION.
 

 ¶ 18. During the State’s examination of Chief Deputy March, the prosecutor elicited testimony about Walden’s statements made to Chief Deputy March and Deputy Chambers; the transcript of Walden’s statements was admitted into evidence, along with a copy of his signed rights-waiver form. Walden objected to the admission of his statements on the ground they were hearsay and the product of leading questions by the police. The trial court admitted the transcript pursuant to Mississippi Rule of Evidence 801(d)(2). On appeal, Walden argues that the trial court erred by admitting his prior statements because: (1) the statements were a product of Walden’s confusion after the death of his sister-in-law and their admission stretched Rule 801(d)(2) to impermissible limits; (2) there was no predicate foundation for Chief Deputy March’s testimony about the statements; and (3) the sole purpose of using Chief Deputy March to introduce the statements was to pre-impeach Walden, if he chose to testify.
 

 ¶ 14. We review the trial court’s admission or exclusion of evidence for abuse of discretion.
 
 Juarez v. State,
 
 965 So.2d 1061, 1065(¶ 9) (Miss.2007). An error in the admission or exclusion of evidence must adversely affect a substantial right of a party in order to warrant reversal.
 
 Id.
 
 A party objecting to the admission of evidence must state the specific ground for the objection, if the specific ground is not apparent from the context. M.R.E. 103(a)(1). And a party, having specifically objected at trial, cannot present different grounds for the objection on appeal.
 
 Williams v. State,
 
 971 So.2d 581, 589(¶ 27) (Miss.2007).
 

 ¶ 15. Mississippi Rule of Evidence 802 provides that hearsay is inadmissible except as provided by law. However, under Rule 801(d)(2), a party’s own statement offered against the party is not hearsay. Therefore, Walden’s statements offered against him were admissible under Rule 801(d)(2).
 
 See Alexander v. State,
 
 759 So.2d 411, 415(¶ 8) (Miss.2000). Walden’s contention that the statements were the product of his confusion or of police coercion is not pertinent to his argument under Rule 801(d)(2). At the trial level, Walden did not seek exclusion of the statements by challenging their voluntariness
 
 *22
 
 or by claiming that law enforcement failed to honor his invocation of a right. Walden only sought exclusion of the statements with his hearsay objection. He did not object to the admission of the statements on foundational grounds or on the grounds of improper impeachment. Therefore, we do not consider the merits of his arguments on these subjects.
 
 Williams,
 
 971 So.2d at 589(¶ 27).
 

 II. WHETHER THE TRIAL JUDGE ERRED BY CRITICIZING THE DEFENDANT’S COUNSEL IN THE PRESENCE OF THE JURY.
 

 ¶ 16. Walden argues that certain statements and rulings by the trial judge during the trial indicated that the judge was predisposed in favor of a conviction, rendering his trial unfair. A criminal defendant is entitled to a fair trial, but not a perfect trial.
 
 Clark v. State,
 
 891 So.2d 136, 140-41(¶ 19) (Miss.2004) (quoting
 
 Brown v. United Staies,
 
 411 U.S. 223, 231-32, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973)). If “the trial judge displays partiality, becomes an advocate, or, in any significant way, conveys to the jury the impression that he has sided with the prosecution,” then this Court will reverse.
 
 Jones v. State,
 
 669 So.2d 1383, 1387 (Miss.1995). We review the statements and rulings cited by Walden to determine whether they indicated that the trial judge was biased in favor of the State.
 

 1Í17. In the first instance of which Walden complains, the trial judge interrupted the defense counsel’s cross-examination of Luther Cowan in order to instruct counsel to stay behind the podium. The trial judge also asked defense counsel to “tone that voice down a little bit.” Defense counsel explained that the circuit clerk appreciated people who talked loudly so that the clerk did not have to strain to hear. The trial judge responded, “but the folks over at the café don’t need to hear.” Defense counsel apologized, explaining that he had a habit of talking loudly. Walden argues that the trial judge’s comment about the café indicated the judge’s bias against him. However, a trial judge has a duty to control the courtroom by using “reasonable measures to efficiently move matters along and keep over-zealous counsel in check.”
 
 In re Blake,
 
 912 So.2d 907, 914(¶ 16) (Miss.2005). We perceive nothing about the trial judge’s comment to defense counsel indicating bias. Rather, it is apparent that the trial judge’s comment, while perhaps creatively phrased, was well within the realm of reasonable measures which a judge may take in order to control courtroom proceedings.
 

 ¶ 18. Secondly, Walden complains that the trial judge showed partiality by limiting his cross-examination of Brown concerning her reluctance to testily. On that occasion, defense counsel asked Brown whether she was testifying as the result of prosecutorial pressure. The prosecutor’s objection was sustained. Defense counsel complained that the ruling was unfair. The trial judge responded that “it was so obvious that his objection was in order that I went ahead and ruled.” Then, the trial judge called the attorneys to the bench and resolved the matter out of the jury’s presence. Again, nothing about this exchange indicated that the trial judge was biased against Walden or against his defense counsel. While the trial judge did state before the jury that the objection was obviously in order, “[tjrial judges may exjalain them rulings on evi-dentiary objections as long as they do not comment upon the evidence in a prejudicial manner.”
 
 McDonald v. State,
 
 881 So.2d 895, 901(¶ 18) (Miss.Ct.App.2004). Applying this standard, the trial judge’s statement was not a prejudicial comment upon the evidence.
 

 
 *23
 
 ¶ 19. Lastly, Walden argues that the trial judge demonstrated bias by allowing the prosecutor undue leeway on the cross-examination of Walden. The actions of which Walden complains are that: (1) the trial judge told Walden to wait for the prosecutor to ask a question before answering; (2) the judge permitted the prosecutor to cross-examine Walden about Brown’s testimony; and (3) the judge allowed the prosecutor to ask Walden about a fact that defense counsel had said in the opening statement would be proven by the evidence, but that Walden’s testimony disavowed. In the first complained-of instance, the trial judge acted to maintain the orderly and coherent presentation of witness testimony. In the second and third instances, the trial judge demonstrated no bias or partiality by determining that the prosecutor’s questions were within the scope of cross-examination.
 
 See
 
 M.R.E. 611. We find nothing about these rulings or about the conduct of the trial judge generally that evinced bias or partiality in favor of the prosecution and against Walden. This issue is without merit.
 

 III. WHETHER THE TRIAL COURT ERRED IN DENYING WALDEN’S JURY INSTRUCTION D-2.
 

 ¶ 20. Walden proffered jury instruction D-2, which instructed the jury to find Walden not guilty if it found that Walden, without design or deliberation to cause death, possessed a pistol and “in the heat of passion in a struggle between James Walden and Nathaniel Walden the fatal shot was fired accidentally and through misfortune, upon any sudden and sufficient provocation.” Though the jury instruction conference was not transcribed, the record shows that the State objected to the instruction and the trial court denied it for reasons including the fact that there was no evidence that Walden fired the gun accidentally. Walden argues that the ruling prevented him from presenting his theory of the case to the jury.
 

 ¶ 21. This Coirnt will find no reversible error when the jury instructions, read as a whole, “fairly announce the law of the case and create no injustice.”
 
 Coleman v. State,
 
 697 So.2d 777, 782 (Miss.1997). A defendant has a fundamental right to present his theory of the case to the jury.
 
 Chinn v. State,
 
 958 So.2d 1223, 1225(1113) (Miss.2007). Therefore, “[w]here the defendant’s proffered instruction has an evidentiary basis, properly states the law, and is the only instruction presenting his theory of the case, refusal to grant it constitutes reversible error.”
 
 Id.
 
 (quoting
 
 Phillipson v. State,
 
 943 So.2d 670, 671-72(¶ 6) (Miss.2006)). While a defendant is entitled to a jury instruction that presents his theory of the case, this entitlement is limited by the court’s ability to refuse a defense instruction that incorrectly states the law or lacks a foundation in the evidence.
 
 Howell v. State,
 
 860 So.2d 704, 745 (¶ 142) (Miss.2003).
 

 ¶ 22. Jury instruction D-2 tracked the language of Mississippi Code Annotated section 97-3-17(b) (Rev.2006), which provides that a killing is excusable when the killing is committed “by accident and misfortune, in the heat of passion, upon any sudden and sufficient provocation.” Walden argues that this instruction had evi-dentiary support in his testimony that he fired the shots into the air without any intent to kill. In
 
 Montana v. State,
 
 822 So.2d 954, 961-62(¶ 28) (Miss.2002), Montana argued that he was entitled to have the jury instructed on the defense of accident and misfortune under section 97-3-17(b). Like Walden, Montana’s theory of defense was that he intentionally fired his weapon into the air without any intent to shoot the homicide victim.
 
 Id.
 
 at 962(¶ 30). The trial court denied the in
 
 *24
 
 struction, and the supreme court affirmed. The supreme court held that under
 
 Evans v. State,
 
 797 So.2d 811 (Miss.2000), and
 
 Day v. State,
 
 589 So.2d 637 (Miss.1991), an accident instruction would have been warranted only if there had been evidence that Montana accidentally fired the gun.
 
 Id.
 
 at 962-63 (¶¶ 33-34). However, Montana admitted that he intentionally fired the gun. The court stated:
 

 The crucial distinction between
 
 Evans
 
 and
 
 Day,
 
 on the one hand, and the case sub judice, on the other, is that there was evidence in
 
 Evans
 
 and
 
 Day
 
 that the firing of the weapon was accidental. There was absolutely no such evidence presented in the case at bar. Rather, Montana’s statement indicates that each and every shot fired from his weapon was intentional. The trial court correctly held that an intentional act cannot be excused under the doctrine of accident and misfortune.
 

 Id.
 
 at 963(¶ 35). As in
 
 Montana,
 
 Walden’s theory of the case was based upon his own testimony that he intentionally fired each shot. There was no evidence from which a jury could have found that Walden fired the shots accidentally. Therefore, jury instruction D-2 lacked an evidentiary foundation, and the trial court correctly denied it. This issue is without merit.
 

 IV. WHETHER THE JURY VERDICT IS THE RESULT OF BIAS AND PASSION ON THE PART OF THE JURY AND CONTRARY TO THE CREDIBLE EVIDENCE ADDUCED AT TRIAL AND TO THE LAW OF MISSISSIPPI.
 

 ¶ 23. Walden’s motion for a judgment notwithstanding the verdict (JNOV) or for a new trial was denied by the trial court. On appeal, Walden argues that he is entitled to a new trial because the verdict was against the overwhelming weight of the evidence. However, Walden also contends that there was no evidence submitted on the element of deliberate design, an argument that challenges the sufficiency of the evidence. Therefore, we undertake a review of both the sufficiency and the weight of the evidence.
 

 ¶ 24. The supreme court has articulated that, upon review of the sufficiency of the evidence, “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ”
 
 Bush v. State,
 
 895 So.2d 836, 843(¶ 16) (Miss.2005) (quoting
 
 Carr v. State,
 
 208 So.2d 886, 889 (Miss.1968)). The supreme court has further stated that:
 

 Should the facts and inferences considered in a challenge to the sufficiency of the evidence “point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,” the proper remedy is for the appellate court to reverse and render. However, if a review of the evidence reveals that it is of such quality and weight that, “having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,” the evidence will be deemed to have been sufficient.
 

 Id.
 
 (citations omitted). In reviewing the sufficiency of the evidence, we consider all of the evidence in the light most favorable to the verdict.
 
 Id.
 

 ¶ 25. Walden was convicted of killing Mary without authority of law and with deliberate design to effect death. Miss. Code Ann. § 97-3-19(1)(a) (Rev.2006).
 
 *25
 
 Walden argues that there was no evidence that he fired the gun with deliberate design to effect death. However, Brown testified that before Walden returned to James’s property and began shooting, Walden discussed his anger at James. He then stated, “I’m going to kill that m-f-“A defendant’s statement that he wanted to kill the victim made prior to the fatal [act is] evidence of malice.”
 
 Dobbins v. State,
 
 766 So.2d 29, 33(¶ 11) (Miss.Ct.App.2000) (citing
 
 Russell v. State,
 
 497 So.2d 75, 76 (Miss.1986)). In addition to Brown’s testimony, other evidence supported a finding that Walden acted with a deliberate design to kill James. This included the testimony that Walden shot at James first and the testimony that James retreated into the trailer house and then Walden shot into the trailer house. Considering the evidence in the light most favorable to the verdict, there was sufficient evidence to enable a rational juror to conclude that Walden shot into the trailer house with a deliberate design to kill James.
 

 ¶ 26. Though there was sufficient evidence that Walden had a deliberate design to kill James, not Mary, Walden’s intent to kill James was transferred to Mary. Under the doctrine of transferred intent, “[w]here there is express malice and an intent to kill, the accidental killing of a person other than the one intended is murder. The malicious intent of the unlawful act directed toward one person is transferred to the other person.”
 
 Id.
 
 (quoting
 
 Ross v. State,
 
 158 Miss. 827, 832, 131 So. 367, 368 (1930)). Walden contends that the doctrine of transferred intent is not a part of the law in Mississippi and, therefore, was inappropriately applied in his case. Contrary to Walden’s contention, “[t]he transferred intent doctrine is well-established in the common law and in Mississippi.”
 
 Dykes v. State,
 
 232 Miss. 379, 386, 99 So.2d 602, 606 (1957). Thus, by operation of law, Walden’s intent to ldll James was transferred from James to the actual victim, Mary. The evidence was sufficient to support Walden’s murder conviction.
 

 ¶ 27. We now turn to the weight of the evidence. “When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush,
 
 895 So.2d at 844(¶ 18). A reversal based on the weight of the evidence does not mean that acquittal was the only proper verdict, but simply signifies the court’s disagreement with the jury’s resolution of the conflicting testimony.
 
 Id.
 
 Nevertheless, a new trial will be granted only in exceptional cases where the evidence preponderates heavily against the verdict.
 
 Id.
 

 ¶ 28. We view the evidence in the light most favorable to the murder conviction.
 
 Id.
 
 James, Brown, and Thomas testified that Walden approached James and began shooting at him. Brown’s testimony indicated that Walden acted with deliberate design to Mil James. James testified that he returned fire after Walden shot into the trailer house. This evidence conflicted with Walden’s testimony that James shot at him first. Walden’s testimony about the number of shots he fired during the incident was contradictory; he first testified that he only fired one shot into the air, but then he testified that he did not know how many rounds he fired into the trailer house. Walden’s testimony also conflicted with his prior statement to the police in which he admitted that he fired the first shot at James followed by five shots into the trailer house. The jury, properly instructed on murder, culpable-negligence
 
 *26
 
 manslaughter, and self-defense, accepted the testimony indicating Walden acted with deliberate design to kill, not in self-defense. “Jurors are permitted, indeed have the duty, to resolve the conflicts in the testimony they hear. They may believe or disbelieve, accept or reject, the utterances of any witness.”
 
 Gossett v. State,
 
 660 So.2d 1285, 1294 (Miss.1995) (quoting
 
 Gandy v. State,
 
 373 So.2d 1042, 1045 (Miss.1979)). We find that the evidence does not preponderate so heavily against the verdict that we must disturb the jury’s resolution of the conflicting testimony. The verdict was not against the overwhelming weight of the evidence.
 

 V. WHETHER THE CUMULATIVE ERRORS AT TRIAL.RESULTED IN A BASICALLY UNFAIR TRIAL OF THE DEFENDANT IN THIS CASE.
 

 ¶ 29. Walden’s final argument is that cumulative errors occurred that rendered his trial basically unfair. In any case in which this Court finds that errors occurred that are not reversible in themselves, we have the discretion to determine whether such errors may, when considered cumulatively, warrant reversal based upon their cumulative prejudicial effect.
 
 Byrom v. State,
 
 863 So.2d 836, 847(¶ 13) (Miss.2003). Walden argues that the trial court’s repeated denial of defense objections, the court’s allowing abusive cross-examination of Walden by the State, and the court’s allowing the State to rely upon the theory of transferred intent deprived him of a fair trial. We have already addressed these issues and others raised by Walden and found that no error occurred. Therefore, there are no errors to consider cumulatively for a resultant prejudicial effect. This issue is without merit.
 

 ¶ 30. THE JUDGMENT OF THE CIRCUIT COURT OF HOLMES COUNTY OF CONVICTION OF MURDER AND SENTENCE OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AND OF SHOOTING INTO AN OCCUPIED DWELLING AND SENTENCE OF TEN YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH FIVE YEARS SUSPENDED AND ON PROBATION, WITH THE SENTENCES TO RUN CONSECUTIVELY, AND TO PAY RESTITUTION IN THE AMOUNT OF $4,500 TO THE CRIME VICTIMS’ COMPENSATION FUND, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANT.
 

 KING, C.J., LEE AND MYERS, P.JJ., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.